## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("Commission") submits this memorandum of law in support of its motion for summary judgment against defendants Global Telecom Services, LLC d/b/a Medical Disposal Devices ("Medical Disposal"), Albert D. LaTouche ("LaTouche") and Salvatore J. Cartelli, Jr. ("Cartelli") (collectively, the "Defendants"). The Commission brings this motion pursuant to Fed. R. Civ. P. 56 and Local Rule 56(a) because there is no genuine issue as to any material fact regarding the Defendants' violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (collectively, the "antifraud provisions").

All documents and testimony overwhelmingly establish that between January 1997 and July 2000, Medical Disposal, its President, LaTouche, and Cartelli, a *de facto* officer of Medical Disposal, conducted a fraudulent offering of securities, selling investment contracts and notes to at least 47 investors, and defrauding them of at least $742,000. Medical Disposal, a company located in Old Lyme, Connecticut, claimed to manufacture and sell the "Needlyzer," a device that safely destroys hypodermic needles. Medical Disposal, however, never successfully commercially manufactured or sold the Needlyzer. LaTouche and Cartelli made a number of material misrepresentations to investors to induce them to purchase Medical Disposal securities. Specifically, LaTouche and Cartelli represented: (1) the United States Food and Drug Administration ("FDA") approved the Needlyzer; (2) Medical Disposal had negotiated contracts with foreign companies to purchase the Needlyzer; (3) Medical Disposal would use investor

funds to manufacture Needlyzers; (4) a company in New York manufactured the Needlyzer for Medical Disposal; and (5) Waste Management, Corp. ("Waste Management"), had agreed to purchase Medical Disposal for $100 million. In fact, all of these statements were false. Moreover, after Medical Disposal raised funds from investors, LaTouche and Cartelli used some of investors' funds for personal purposes.

Additionally, throughout discovery in this action, LaTouche and Cartelli asserted their Fifth Amendment privilege against self-incrimination, and refused to testify about their roles in Medical Disposal's fraudulent efforts to raise funds from investors. The Court should draw an adverse inference against LaTouche and Cartelli based upon their invocation of the Fifth Amendment privilege. *See SEC v. Grossman, et al.*, 887 F. Supp. 649, 660-61 (S.D.N.Y. 1995), *aff'd, SEC v. Hirshberg*, 1999 App. Lexis 4764 (2d Cir. 1999).

Thus, because the record in discovery overwhelmingly establishes that Medical Disposal, LaTouche and Cartelli violated the antifraud provisions, the Commission is entitled to summary judgment as a matter of law. The Court should also impose permanent injunctions, order disgorgement and prejudgment interest and civil penalties from the Defendants, and permanently bar LaTouche and Cartelli from acting as officers or directors of a public company.

For the reasons more fully set forth below, the Commission respectfully requests that the Court grant the Commission's motion for summary judgment.

# FACTS[1]

## A.    Background

The Needlyzer is a device that purportedly destroys hypodermic needles safely (The Needlyzer's slogan is "Don't get stuck with someone else's problem"). (St. §§ 5, 6). LaTouche, age 67 and a resident of Haddam, Connecticut, learned about the Needlyzer in the early 1990s from his brother, Brian LaTouche. (St. §§ 1, 4).  During this time, Bob Hall ("Hall") manufactured the Needlyzer, and in approximately 1992, Brian LaTouche obtained from Hall the rights to market and sell the Needlyzer in Tennessee and other areas. (St. §§ 3, 7).  In 1993 or 1994, LaTouche signed a contract with Brian LaTouche for the rights to market and sell Needlyzers in the Northeast United States. (St. § 8).

In approximately 1994, LaTouche asked Cartelli, a 53 year old car salesman who resides in Portland, Connecticut, to help him sell the Needlyzer and manage Medical Disposal's business. (St. §§ 2, 9).  In early 1994, Cartelli asked his friend, Joseph A. Scafidi ("Scafidi"), to assist him with selling the Needlyzer. (St. § 10).  Cartelli told Scafidi that the Needlyzer was in the process of receiving FDA approval. (St. § 11). Between September and December 1994, Scafidi worked with Cartelli to sell the Needlyzer by demonstrating its use at hospitals and healthcare companies. (St. §§ 12-13). Since the FDA had not approved the use of the Needlyzer, however, no hospital or other entity placed any purchase orders with LaTouche, Cartelli or Scafidi. (St. § 14).  Between 1992 and 1994, LaTouche was unsuccessful in his attempts to sell any Needlyzers. (St. §

---

[1]    The evidence before the Court on this motion is contained in the exhibits accompanying the Declaration of William Finkel in Support of Plaintiff's Motion for Summary Judgment ("Finkel Dec.").  The evidence is reflected in the Commission's Statement Pursuant to Local Civil Rule 56(a)(1) ("St.").

15).  In 1994, as the result of a lawsuit between Brian LaTouche and Hall, Brian

LaTouche no longer supplied LaTouche with Needlyzers, and LaTouche temporarily

ceased his efforts to sell it. (St. §§ 16-18).

**B.**     **LaTouche and Cartelli Attempted to Manufacture and Sell the Needlyzer**

After temporarily ceasing their efforts to sell the Needlyzer as dealers for Brian

LaTouche, LaTouche and Cartelli agreed to attempt to manufacture and sell the

Needlyzer independent of Brian LaTouche. (St. § 19).  In or around December 1995,

LaTouche formed Global Telecom Services, LLC, a Connecticut company that claimed

to have two lines of business. (St. §§ 20-21).  One of its businesses purportedly sold

"900" telephone numbers. (St. § 22).  Its other business, Global Telecom Services, LLC

d/b/a Medical Disposal Devices, purportedly manufactured and sold Needlyzers. (St. §

23).  LaTouche was the President of Global Telecom Services, LLC. (St. § 21).  Cartelli

worked as LaTouche's partner at Medical Disposal, and he managed Medical Disposal's

business. (St. §§ 24-25).

**1.**     **LaTouche and Cartelli Did Not Manufacture the Needlyzer**

Medical Disposal planned to retain a company in New York to manufacture the

Needlyzer. (St. § 26).  In approximately 1996, LaTouche and Cartelli asked Scafidi if

Dayton T. Brown, Inc., ("Dayton Brown"), the company where Scafidi worked, had

interest in manufacturing the Needlyzer if Medical Disposal obtained the patent rights

and FDA approval for the Needlyzer. (St. § 27).  In mid-1997, LaTouche and Cartelli

visited Scafidi at Dayton Brown's manufacturing plant in Bohemia, New York, to discuss

manufacturing the Needlyzer. (St. § 28).  Scafidi told LaTouche and Cartelli that he

would need approval from Dayton Brown's Board of Directors prior to agreeing to

manufacture the Needlyzer for Medical Disposal. (St. § 29).  Scafidi then presented the idea- that Dayton Brown manufacture the Needlyzer for Medical Disposal- to Dayton Brown's Board of Directors. (St. § 30).

Dayton Brown, however, never entered into a contract with Medical Disposal to manufacture the Needlyzer. (St. § 31).  Dayton Brown's Board told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must: 1) obtain FDA approval for the Needlyzer; 2) acquire the patent rights for the Needlyzer; and 3) provide the Needlyzer parts for assembly. (St. §§ 32-34).  Moreover, Dayton Brown's Board merely said that it would <u>consider</u> manufacturing Needlyzers for Medical Disposal if Medical Disposal first met these conditions. (St. § 35).

Scafidi explained to Cartelli these three conditions. (St. §§ 36-38).  Thereafter, Cartelli no longer pursued the idea of having Dayton Brown manufacture the Needlyzer. (St. § 39).  Moreover, Medical Disposal never entered into a contract with any other company to manufacture the Needlyzer. (St. § 40).  No company ever manufactured the Needlyzer for Medical Disposal, and Medical Disposal never built any Needlyzers. (St. §§ 41-42).

### 2. LaTouche and Cartelli Did Not Acquire Patent Rights For the Needlyzer

Between December 1996 and September 1997, Medical Disposal attempted to purchase the patent rights for the Needlyzer. (St. § 43).  Scafidi referred Cartelli to Robert Faber ("Faber"), a patent attorney. (St. § 44).  On or about December 19, 1996, Cartelli retained Faber to purchase the patent rights for the Needlyzer. (St. § 45).  Cartelli, however, did not acquire the patent rights for the Needlyzer as of September 1997, the

date Faber last represented him. (St. §§ 46-47). In fact, Medical Disposal never acquired

the patent rights for the Needlyzer. (St. § 48). Cartelli knew that Medical Disposal did

not acquire the patent rights to the Needlyzer, and he even told Scafidi that he was

unsuccessful in obtaining the device's patent rights. (St. § 49).

### 3. LaTouche Discussed FDA Approval and Patent Rights with Brian LaTouche

LaTouche also knew that Medical Disposal never acquired the patent rights for

the Needlyzer. (St. § 50). Brian LaTouche told LaTouche that it was unclear who owned

the patent to the Needlyzer. (St. § 51).

In November and December 1996, LaTouche told Brian LaTouche that Scafidi

and Cartelli, or their attorneys, had signed a contract with the patent owners of the

Needlyzer. (St. §§ 52-53). In response, Brian LaTouche called one of the patent owners

of the Needlyzer who told Brian LaTouche that there was no contract signed with

Cartelli, Scafidi or their attorney. (St. §§ 54-55). Brian LaTouche then told this to

LaTouche. (St. § 56).

LaTouche and Brian LaTouche also discussed the Needlyzer's lack of FDA

approval. (St. §§ 52, 57). For example, in November 1994, Brian LaTouche discussed

with LaTouche that, when selling the Needlyzer, they were not allowed to claim that it

was FDA approved. (St. § 58). Thereafter, on November 26, 1996, LaTouche told Brian

LaTouche that Cartelli was planning to meet with John Lucas ("Lucas"), an FDA official,

to obtain FDA approval for the Needlyzer, while Lucas was on vacation. (St. §§ 59-62).

As a result of his conversation with LaTouche, Brian LaTouche called the FDA, who told

Brian LaTouche that: 1) there were no pending requests for FDA approval of the

Needlyzer; 2) no member of the FDA would meet with someone applying for approval; and 3) Lucas was not on vacation. (St. § 63-66).  In December 1996, Brian LaTouche then told LaTouche all this information. (St. §§ 67-69).

### 4.    Cartelli Created a Brochure for the Needlyzer

In approximately late 1997 or early 1998, Cartelli helped create a brochure for Medical Disposal which described the Needlyzer. (St. § 70).  Cartelli's girlfriend and direct report at Medical Disposal, Mary Beth Mackin ("Mackin"), told Medical Disposal's employees to create a brochure for the Needlyzer. (St. §§ 72-73).  Among other things, Medical Disposal's brochure stated that the Needlyzer was FDA approved. (St. § 71).  Cartelli directed Medical Disposal employees to include "FDA Approval" on the brochure, even though Cartelli knew the FDA had not approved its use. (St. §§ 72-75).  Cartelli knew this because his attempts to sell the Needlyzer in 1994 were unsuccessful because the Needlyzer was not FDA approved, and Scafidi told Cartelli in 1997 that Dayton Brown would not consider manufacturing the Needlyzer until after Medical Disposal obtained the patent rights for the Needlyzer and got FDA approval. (St. §§ 14, 36).

### C.    LATOUCHE AND CARTELLI MADE FALSE AND MISLEADING STATEMENTS TO SOLICIT INVESTORS

### 1.    LaTouche And Cartelli Met With Investors

Between January 1997 and July 2000, LaTouche and Cartelli solicited at least forty-seven persons to invest in Medical Disposal. (St. §§ 76-80).  LaTouche and Cartelli both demonstrated the Needlyzer to investors. (St. §§ 81-82).  LaTouche and Cartelli also

7

both distributed to investors Medical Disposal's brochure describing that the Needlyzer was FDA approved. (St. §§ 83-84).

To induce his friends to invest, LaTouche made false and misleading statements regarding Medical Disposal and the Needlyzer. LaTouche told investors that Medical Disposal was raising capital to pay the manufacturing costs of producing the Needlyzer and that Medical Disposal would use their funds to manufacture Needlyzers. (St. §§ 85-86). LaTouche told at least one investor, Gaetan Roy ("Roy"), that Cartelli was LaTouche's partner in Medical Disposal, that the Needlyzer was FDA approved and that Medical Disposal had acquired the patent rights to the Needlyzer. (St. §§ 87-89). LaTouche also told investors, including Robert Nettleton ("Nettleton"), and Louis Fabri ("Fabri"), that a company in New York manufactured the Needlyzer for Medical Disposal, even though he made absolutely no efforts to verify this. (St. §§ 90-92).

Cartelli also made false and misleading statements to investors. For example, Cartelli told investors, including Roy, that Medical Disposal would use their funds to manufacture Needlyzers. (St. § 93). Moreover, at an investor meeting where LaTouche was present, Cartelli told Roy that: Medical Disposal employed forty-one salesmen to sell the Needlyzer; the FDA had approved the Needlyzer; Medical Disposal owned the patent rights to market and build the Needlyzer; Medical Disposal had enough parts stored at a warehouse in Florida to assemble 10,000 Needlyzer units; Pfizer, a large pharmaceutical company, was testing 25 units and might order 200 additional units; and that Medical Disposal had an agreement with a company, Dayton Brown, that would begin manufacturing Needlyzers once Medical Disposal had orders for Needlyzers. (St. §§ 94-99).

All of these statements were false, because, as discussed above, Medical Disposal never acquired the patent rights or obtained FDA approval for the Needlyzer. Moreover, neither Dayton Brown nor any other company ever manufactured or agreed to manufacture the Needlyzer for Medical Disposal. (St. §§ 40-42, 48, 75).

LaTouche and Cartelli also attended follow-on investor meetings. (St. § 100). In or around 1998, LaTouche and Cartelli held a meeting for approximately 10 persons who had invested in Medical Disposal. (St. § 101). During this meeting, Cartelli told investors, including Roy and Raymond Flavell ("Flavell"), that he ran Medical Disposal's business. (St. § 102). Cartelli also said that it was expensive to run Medical Disposal's business and that the investors' funds were used to run Medical Disposal's business. (St. § 103). Cartelli also said that Medical Disposal had negotiated several deals with foreign companies to purchase Needlyzers. (St. § 104).

### 2. LaTouche And Cartelli Falsely Told Investors About Contracts With Foreign Companies

LaTouche and Cartelli told investors about numerous purchase orders to purchase the Needlyzer. LaTouche and Cartelli also told investors about negotiated contracts with foreign companies to purchase the Needlyzer. (St. §§ 104-106, 126-127). LaTouche's and Cartelli's statements to investors regarding contracts with foreign companies were false because no company ever entered into a contract to purchase Needlyzers from Medical Disposal. (St. § 107).

9

3.      **LaTouche And Cartelli Falsely Told Investors About Deals With The Vatican And Italian Companies**

Cartelli gave LaTouche a letter purportedly from Archbishop Zenon Grocholewski ("Grocholewski") to Cartelli using the Vatican's letterhead ("Vatican Letter"). (St. § 108).  The Vatican Letter stated, in part: "[w]e will give you the support that you require to sell this product of safety [Needlyzer] to all interested Healthcare Facilities under the Vatican jurisdiction." (St. § 109).  The letter was a forgery. (St. § 110).  Grocholewski did not sign this letter. (St. § 111).  Grocholewski did not draft or assist in drafting the Vatican letter, and prior to May 2002, Grocholewski had never seen this letter. (St. § 112-113).  In fact, prior to May 2002, Grocholewski had never even heard of: 1) the Medical Disposal Device; 2) any company called Medical Disposal Devices; 3) the Needlyzer; or 4) Cartelli. (St. §§ 114-115).  Moreover, Grocholewski never, either individually or as a representative of the Vatican, told Cartelli he supported or agreed to support the Medical Disposal Device. (St. § 116).  Finally, as an Archbishop, Grocholewski never used stationary with the Papal Coat of Arms letterhead. (St. § 117).

In or around February 1998, Cartelli showed the Vatican Letter to Scafidi. (St. § 118).  Scafidi believed the Vatican Letter was a forgery and expressed his skepticism.  Scafidi thereafter had a friend contact the Vatican, who confirmed the letter was a forgery, and Scafidi told this to Cartelli. (St. §§ 119-120).  Several weeks later, Cartelli admitted to Scafidi that the Vatican Letter indeed was a fake. (St. § 121).

Brian LaTouche also expressed skepticism about Cartelli's deals to LaTouche.  For example, Brian LaTouche specifically told LaTouche that LaTouche should not believe Cartelli's stories of sales of the Needlyzer to foreign companies, such as deals in

Italy. (St. § 122).  Brian LaTouche warned LaTouche that the pending deals Cartelli told LaTouche about were "bogus." (St. § 123).

Despite the skepticism expressed by their close confidants, LaTouche and Cartelli showed investors the Vatican Letter and told them about deals to sell Needlyzers to foreign companies.  LaTouche gave investors, such as Roy and Fabri, a copy of the Vatican Letter. (St. § 124).  Cartelli also told Roy about pending agreements with foreign companies and the Vatican. (St. § 125).  Cartelli told Roy that he was expecting orders for tens of thousands of Needlyzer units and that the Needlyzer's manufacturer "figures in three months we'll be putting 10,000 units out the door" and that "a thousand [Needlyzers] for Guatemala at least, and about 10,000 or about 9-10,000 for the Vatican." (St. §§ 126-127).  Moreover, LaTouche and Cartelli sent newsletters to investors that described pending deals with the Vatican, among other entities.  (St. §§ 128-129).

### 4.    The Defendants Sent Newsletters to Investors Containing Materially False And Misleading Statements

Between April 1998 and October 1999, LaTouche edited and sent monthly newsletters to investors based on information that Cartelli provided to LaTouche. (St. § 128-129).  In addition to descriptions of pending deals with the Vatican, the newsletters described Medical Disposal's efforts to sell the Needlyzer to companies in England, Guatemala and India. (St. § 130).  LaTouche did not contact the companies listed in the investor newsletters to verify whether any of the information contained in the investor newsletters was correct. (St. §§ 131-137).

### a.    There Were No Agreements to Sell the Needlyzer in Hawaii

Mahbub A. Siddiqui ("Siddiqui") owns and operates Amro-Asian Trade, Inc.

("Amro-Asian"), an export and import business, located in Honolulu, Hawaii. (St. § 138).
Between June and August 1998, Siddiqui had several preliminary communications,
consisting of facsimile transmissions and telephone discussions with Cartelli regarding
the possibility of selling Needlyzers to distributors in Bangladesh and Hawaii. (St. §§
138-141). Siddiqui, however, never entered into any agreement with Medical Disposal or
Cartelli to purchase, sell or distribute Needlyzers. (St. § 142).

Despite this, LaTouche and Cartelli sent investors a newsletter dated August 26,
1998 that states in part: "Mr[.] Siddiqui from Hawaii is to handle Bangladesh, and is
waiting for an evaluation of the product, to see if its affordable in that country." (St. §
143). This statement was false. At no time did Amro-Asian or Siddiqui agree to
"handle" Bangladesh for Cartelli or Medical Disposal. (St. § 144). Moreover, as of
August 26, 1998, Siddiqui already told Cartelli that the price Medical Disposal was
seeking to charge was too high, and that Siddiqui was no longer waiting for a market
evaluation of Cartelli's product. (St. § 145).

The same newsletter also states that: "[Siddiqui] has also expressed and [sic]
interest in pursuing this in eight other countries." (St. § 146). This statement was also
false. At no time did Amro-Asian or Siddiqui discuss with Cartelli or Medical Disposal
the purchase, sale or distribution of the Needlyzer in eight other countries. (St. § 147).
Siddiqui only had preliminary discussions with Cartelli regarding the possibility of
selling the Needlyzer in Bangladesh, Hawaii and other U.S. territories. (St. § 148).

LaTouche and Cartelli continued to detail their prospects in Hawaii in a
subsequent newsletter to investors. The newsletter dated September 29, 1998 states:
"Our contact in Hawaii received a Demo Unit [of the Needlyzer.] . . . is very pleased with

12

[the Needlyzer] and says he will be in contact with us shortly with a proposal for both Hawaii and Indonesia." (St. §§ 149-150). These statements were false. Siddiqui never received a demonstration unit of the Needlyzer, or expressed that he was "pleased" with the Needlyzer or even discussed with Cartelli the purchase, sale or distribution of Medical Disposal's Needlyzer in Indonesia. (St. §§ 151-153).

        b.    <u>Contracts With a Company in India</u>

Subsequent investor newsletters contained even more outrageous claims. Between January and October 1999, Medical Disposal sent four newsletters falsely describing a sale of Needlyzers to a company in India and Medical Disposal's efforts to collect payment on the sale. The investor newsletter dated January 26, 1999, states in part: "in December we went to India to meet with a company … they said they plan to make an initial acquisition of 5000 [Needlyzer] units around February 1, 1999." (St. § 154). The investor newsletter dated June 3, 1999, states in part: "India has an order in place for 5000 units and we are presently building their units for them." (St. § 155). The investor newsletter dated August 9, 1999, states in part: "The India wire which we expected to have in our account shortly after our last letter, ended up in a holding account at the Federal Clearing House. This was caused because the money was wired into an account where the Corporate name (Medical Disposal Devices) and the account number did not match. Our attorney has been working with the attorney in India correcting the error. We had to reinvoice India for the product being purchased, with the correct Corporate name which is Global Telecom Services, (Medical Disposal Devices is a D/B/A of Global Telecom Services), and the matching Account Number. Our Attorney assures us that the client is very anxious to receive the product [sic] and expect no further

13

delays." (St. § 156).  The newsletter dated October 1, 1999, states in part: "We have been in close contact with our Attorney who has been in constant communication with the Attorney from India, and he assures us that all the problems have been resolved and the funding is on its way.  He tells us to have manufacturing gear up to begin production within a week." (St. § 157).

The statements in these newsletters were all false.  As discussed above, Medical Disposal never entered in a contract with any company to purchase Needlyzers. (St. § 107).  LaTouche sent out these newsletters even though he admitted that he began having doubts about the veracity of Cartelli's statements around August 1999, and he never saw any written agreements or had any contact with any Indian Company. (St. §§ 136-137, 158).

**5.    LaTouche and Cartelli Falsely Told Investors Waste Management Planned to Acquire Medical Disposal**

In or around October 1999, Steve Epstein ("Epstein"), an employee of Gottesman Company, a business broker, discussed with Cartelli the possibility of another company acquiring Medical Disposal. (St. § 159).  Cartelli falsely told Epstein that Cartelli was Medical Disposal's CEO, and that Medical Disposal had seven offices, 200 employees and $20 million and $40 million in profits in 1997 and 1998, respectively.  Cartelli also falsely told Epstein that Faber was then representing Medical Disposal. (St. § 160).  As discussed above, Medical Disposal had never entered into a contract to sell Needlyzers, and Faber last represented Cartelli in September 1997. (St. §§ 46, 107).

Other than these preliminary discussions, the Gottesman Company did not participate in attempting to facilitate the acquisition of Medical Disposal. (St. § 161).

14

Epstein never disclosed to Cartelli the name of any potential acquiring company because Cartelli did not sign a confidentiality agreement. (St. §§ 162-163).  Cartelli's discussions with Epstein ended when Cartelli did not respond to Epstein's letters. (St. § 164).  No company ever offered to acquire Medical Disposal. (St. § 165).

Cartelli, however, falsely told LaTouche that he had negotiated Waste Management's acquisition of Medical Disposal for $100 million. (St. § 166).  Cartelli also told Global Telecom Services' employees that Medical Disposal was being sold. (St. § 167).  Cartelli then gave LaTouche copies of documents reflecting that Waste Management acquired Medical Disposal for $100 million dollars. (St. § 168).

Without conducting any due diligence, LaTouche told investors, including Roy and Fabri, about the planned acquisition of Medical Disposal for $100 million. (St. §§ 168, 169-170).  LaTouche also told investors, such as Roy and Fabri, that Medical Disposal needed money to pay the costs associated with completing Medical Disposal's acquisition. (St. § 171).

**6.      LaTouche And Cartelli Used Investors' Funds For Undisclosed Purposes**

Although Medical Disposal raised a total of $742,000, LaTouche and Cartelli did not use the investors' funds to manufacture the Needlyzer.  Instead, LaTouche deposited those funds into Medical Disposal's bank account. (St. § 172).  LaTouche and Cartelli then used these funds to operate Global Telecom's business selling "900" telephone numbers and to pay for LaTouche's and Cartelli's personal expenses.[2]  For example,

---

[2]      LaTouche and Cartelli had signature authority for Medical Disposal's bank account. (St. § 174).  Cartelli controlled Medical Disposal's bank account and was in charge of Medical Disposal's finances. (St. § 175).  Cartelli misappropriated at least

Cartelli wrote approximately $176,000 worth of checks to himself from Medical

Disposal's bank account and Mackin used approximately $64,729 to pay for advertising

for the "900" telephone number business. (St. §§ 173, 176). Medical Disposal never

repaid any funds to investors. (St. § 180).

**D.    LaTouche And Cartelli Sold Securities In the Form of Investment Contracts and Notes**

As a result of LaTouche's and Cartelli's false representations, 47 individuals

invested $742,000 in Medical Disposal. (St. §§ 78, 80). The investments of 42

individuals were reflected by a contract, which LaTouche signed as Medical Disposal's

President. (As will be discussed below, five other investors purchased notes.) (St. § 181).

According to these contracts, individuals agreed to invest a specific sum, and Medical

Disposal promised to pay these investors royalties based on the number of Needlyzers

sold. (St. § 182). The amount of the royalty varied depending on the amount of the

investment. (St. § 182). Generally, for every $10,000 invested, an investor received a

royalty of $1.00 for every Needlyzer sold. The contracts also provided that Medical

Disposal would repay investors their entire investment with interest if Medical Disposal

never sold any Needlyzers. (St. § 183).

Between February and July 2000, LaTouche solicited five individuals to invest in

Medical Disposal. These investments took a different form than the previous

---

$314,000 from Medical Disposal, including depositing at least $128,000 of investors' funds into his father's bank account, which he controlled, and at least $10,000 into his personal account. (St. §§ 176-178). In addition, LaTouche received at least $18,000 of investors' funds. (St. § 179). The remaining funds were generally used for expenses related to operating the "900" telephone number business, such as rent and salaries for salesmen and secretaries, and paying for Cartelli's bills and son's college tuition. (St. § 173).

investments.  These instruments, which were notes, promised "limited investors" high interest rates to be paid within a short amount of time. (St. §§ 184-185).  For example, one note promised to pay the original investment plus 50% interest within 45 days.  Another note promised to pay $25,000 in 180 days for an investment of $20,000. (St. § 185 ).  LaTouche signed these notes as President of Medical Disposal. (St. § 185).

      **E.**      **LaTouche and Cartelli Invoked Their Fifth Amendment Privilege Against Self-Incrimination**

LaTouche and Cartelli asserted their Fifth Amendment privilege against self-incrimination and refused to testify during discovery.  In lieu of attending their depositions, LaTouche and Cartelli each signed a declaration whereby they asserted their Fifth Amendment privilege regarding all matters concerning Medical Disposal and the Needlyzer, including, but not limited to, all communications made to Medical Disposal investors, and all knowledge LaTouche and Cartelli had concerning the Needlyzer. (Finkel Dec., Exs. 9 at § 3, 11 at § 3).  In their declarations, LaTouche and Cartelli also acknowledged that the Commission will rely on LaTouche's and Cartelli's affidavits in moving to preclude LaTouche and Cartelli from offering their testimony concerning this action. (Finkel Dec., Exs. 9 at §§ 4-5, 11 at §§ 4-5).

## ARGUMENT

### I.

### This Court Should Grant The Commission Summary Judgment Against the Defendants As To Liability On All Claims For Relief

Summary judgment is appropriate in Commission enforcement cases involving violations of the antifraud provisions of the federal securities law when there is no

genuine issue of fact. *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978)(affirming district court's grant of summary judgment to the Commission on its claim of violations of the antifraud provisions of the federal securities laws); *SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y. 1995)(awarding summary judgment to the Commission on its claim of violations of the antifraud provisions of the federal securities laws), *aff'd*, *SEC v. Hirshberg*, 1999 App. Lexis 4764 (2d Cir. 1999).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] that demonstrate the absence of a material fact." *Celotex Corp. v. Cattrett,* 477 U.S. 317, 323 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). To prevent summary judgment, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Id*. at 587 (emphasis in original). "The opponent's version of the facts 'must support a viable theory which would entitle [him], if accepted, to a judgment as a matter of law.' At the summary judgment stage, the court's function is not to weigh the evidence, but to determine whether any genuine issue for trial exists." *SEC v. Electronics Warehouse, Inc.,* 689 F. Supp. 53, 58)(D. Conn. 1988) (citations omitted), *aff'd, SEC v. Calvo*, 891 F.2d 457 (2d Cir. 1989). To be a "genuine" issue of fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial,'" and summary judgment should be granted. *Matsushita*, 475 U.S. at 587.

The Court should also draw an adverse inference against the Defendants and preclude them from introducing certain evidence in response to this summary judgment motion. The Court may draw an adverse inference against parties who assert their Fifth Amendment privilege in civil litigation. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) (adverse inference is permitted in civil action even when "the government is a party to the action and would benefit from the drawing of the inference."). This adverse inference may contribute to findings in Commission civil enforcement actions, including relief sought in a motion for summary judgment. *SEC v. Gilbert*, 79 F.R.D. 683, 685-86 (S.D.N.Y. 1978). The Court may preclude Defendants who assert their Fifth Amendment privilege from introducing evidence in support of positions on which they had declined to provide discovery on the basis of asserting their privilege. *United States v. Certain Real Property and Premises Known as 4003-4005 5th Ave.*, 55 F.3d 78, (2d Cir.1995); *see also SEC v. Grossman, et al.*, 887 F. Supp. 649, 660-61 (S.D.N.Y. 1995) (adopting magistrate judge's ruling not to allow defendant who asserted his Fifth Amendment privilege during discovery to consider defendant's SEC investigative testimony taken prior to asserting his Fifth Amendment privilege and an affidavit prepared after asserting his Fifth Amendment privilege in response to a summary judgment motion), *aff'd*, *SEC v. Hirshberg*, 1999 App. Lexis 4764 (2d Cir. 1999).[3]

---

[3]    If the party asserting the privilege seeks to waive it at a later stage, the Court considers "the nature of the proceeding, how and when the privilege was invoked, and the

The Commission is entitled to summary judgment against the Defendants because there is no genuine issue of material fact for trial. The Commission has more than met its burden on all of the elements of its claims, and the uncontroverted record shows that the Defendants violated the federal securities laws.

**A.    The Medical Disposal Investment Contracts and Notes Are Securities**

**1.    Medical Disposal's Investment Contracts Are Securities**

The first 42 investments that LaTouche and Cartelli sold to investors in Medical Disposal are "investment contracts" under Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).  In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), the Court held that an investment contract is an investment program that "involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *See also SEC v. Edwards*, 124 S. Ct. 294 (2004).  In deciding whether a venture is an investment contract under the *Howey* test, courts look to the "representations made by the promoters, not their actual conduct." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (citing *SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 211 (1967)); *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344 (1943).  *See also Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974)(Court viewed the promoter's commitments and

---

potential for harm or prejudice to opposing parties in determining an appropriate outcome." *SEC v. Hirshberg*, 1999 App. Lexis 4764 (2d Cir. 1999) (citing *4003-4005 5th Ave.*, 55 F.3d at 84).  If "the litigant's request to waive comes only at the 'eleventh hour' and appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation, a trial court may be fully entitled, for example, to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Id.*

representations in deciding that the sale of warehouse receipts were investment contracts).

a.    Medical Disposal Investors Invested Money with an Expectation of Profit

Forty-two individuals invested a total of $677,500 in Medical Disposal for the purported purpose of enabling Medical Disposal to manufacture and sell the Needlyzer. The investment contracts provided that Medical Disposal would pay investors royalties based on the number of Needlyzer units the company sold. Indeed, the amount of the royalty increased as the amount of money invested increased (i.e., for every $10,000 invested, the investor would receive a royalty of $1.00 for every Needlyzer sold). The investment contracts also provided that Medical Disposal would repay investors "with interest" if no Needlyzers were sold. Unquestionably, investors made an investment of money with the expectation of receiving a profitable return from Medical Disposal.

b.    There was a "Common Enterprise"

To satisfy the "common enterprise" requirement of the *Howey* test, the Second Circuit requires "horizontal commonality." Horizontal commonality requires the tying of each individual investor's fortunes to the fortunes of other investors by the pooling of assets. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

Medical Disposal's investment scheme -- its purported plan to manufacture and sell Needlyzer units for profit -- constituted a common enterprise. Specifically, horizontal commonality existed because when Medical Disposal sold its contracts, LaTouche and Cartelli represented to investors that Medical Disposal would use their funds, in conjunction with other investors' funds, to operate Medical Disposal and

manufacture and sell Needlyzers. According to the terms of the contract, each investor was then to receive a "royalty" based on the number of Needlyzer units Medical Disposal sold. Thus, investors' profits were dependent on the profitability of Medical Disposal's business as a whole because the more Needlyzers Medical Disposal sold, the more royalties the investors received. *See SEC v. Parkersburg Wireless, LLC, et. al.*, 991 F. Supp. 6, 7-8 (D.D.C. 1997) (sale of memberships in a LLC for a pro rata share of revenue is a security).

  c. <u>Investors Expected to Make Money "Solely from the Efforts of Others"</u>

   The requirement under the *Howey* test that expected profits be derived "solely from the efforts of others" is satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise." *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (*quoting SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 414 U.S. 821, 894 (1973)); *see also Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 65 (2d Cir. 1983)("Where the investing limited partners exercised no managerial role in the partnership's affairs, courts have held that limited partnership interests are securities."). Medical Disposal, LaTouche and Cartelli managed Medical Disposal and conducted its business without any investor participation in Medical Disposal's daily operations. Thus, investors' expected profits were to be derived solely from the efforts of others.

   Thus, because these three elements are satisfied, the investments Medical Disposal sold to investors were investment contracts within the meaning of Section

2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange
Act, 15 U.S.C. § 78c(a)(10).

**2.      The Notes Medical Disposal Sold to Investors Are Securities**

a.      <u>The Seven Instruments Sold To Investors Are Notes</u>

Medical Disposal also sold seven notes to five investors between February and
July 2000.  A "note" is "[a]n instrument containing an express and absolute promise of
[the] signer (*i.e.* maker) to pay to a specified person or order, or bearer, a definite sum of
money at a specified time."  Black's Law Dictionary 1060 (6th ed. 1990).  LaTouche, on
behalf of Medical Disposal, the notes' maker, signed the notes that acknowledged
Medical Disposal's absolute promise to pay a specified investor a definite sum of money
at a specified time.

The notes Medical Disposal sold are securities.  Section 2(a)(1) of the Securities
Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. §
78c(a)(10), include notes within the definition of a security.  Additionally, the Supreme
Court established the "family resemblance" test to determine whether notes are securities.
*Reves v. Ernst & Young*, 494 U.S. 56 (1990).  Under the family resemblance test, notes
are presumed to be securities unless they resemble one of the judicially enumerated
instruments that are not securities.[4]  There are four factors to consider under this test: (1)
the motivations that would prompt a reasonable buyer and seller to enter into the

---

[4]      Notes that are not securities include: notes delivered in consumer financing, notes
secured by a mortgage on a home, short-term notes secured by a lien on a small business
or some of its assets, notes evidencing a character loan to a bank customer, short-term
notes secured by an assignment of accounts receivable, notes which simply formalize an
open-account debt incurred in the ordinary course of business and notes evidencing loans
by commercial banks for current operations.  *Reves*, 494 U.S. at 65.

transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations

of the investing public; and (4) whether some factor, such as the existence of another

regulatory scheme, significantly reduces the risk of the instrument, thereby rendering the

application of securities laws unnecessary. *Id.* at 65.

i.      The Motivation of the Buyer and Seller

The first *Reves* factor requires examining "the transaction to assess the

motivations that would prompt a reasonable seller and buyer to enter into it.  If the seller's

purpose is to raise money for the general use of a business enterprise or to finance

substantial investments and the buyer is interested primarily in the profit the note is

expected to generate, the instrument is likely to be a security." *Id.* at 66.  Here, Medical

Disposal's purported purpose was to raise money to facilitate the sale of Medical

Disposal to Waste Management.  The five investors were interested primarily in the profit

of the note -- namely, the high interest rates (e.g., 100%).  *See id.* at 62 n.4 ("profit in the

context of notes . . . undoubtedly includes interest").

ii.      Plan of Distribution

The second *Reves* factor looks to whether there is "common trading for

speculation or investment" in the instrument. *Id.* at 66.  Offers and sales to a broad

segment of the public are sufficient to establish "common trading" in an instrument. *Id.*

at 68.  Here, the sale of notes to five customers does not constitute a broad segment of the

market.  Even without a plan of distribution, however, Medical Disposal's notes are

securities.  The courts have held that a debt instrument may be distributed to only one

investor, and it can still be a "security."  *National Bank of Yugoslavia v. Drexel Burnham*

*Lambert, Inc.*, 768 F. Supp. 1010, 1015-16 (S.D.N.Y. 1991); *Leemon v. Burns*, 175 F.

24

Supp.2d 551, 559 n.14 (S.D.N.Y. 2001). *See Stoiber v. SEC*, 161 F.3d 745, 752 (D.C. Cir. 1998) ("the plan of distribution in part signals that the notes might not be securities, but that factor by itself is not dispositive.").

Additionally, in conjunction with the plan of distribution factor, some courts have weighed the lack of a plan of distribution against the purchasing individuals' need for the protection of the securities laws. *See McNabb v. SEC*, 298 F.3d 1126, 1132-33 (9th Cir. 2002) (where ten notes sold to six investors did not constitute a plan of distribution, the court considered the fact that unsophisticated purchasers would benefit from the protection of the securities laws). Here, Medical Disposal sold its notes to unsophisticated individuals who would benefit from the protection of the securities laws. Consequently, this counterbalances the fact that there was no plan of distribution for the Medical Disposal notes. *See id.*

### iii.    Reasonable Expectation of the Investing Public

The reasonable expectation of investors further demonstrates that the notes are securities because the investors expected to profit from their investments through earning interest. Moreover, where a financial instrument describes itself as an investment, purchasers can reasonably expect that they are purchasing securities covered by the federal securities laws. *Reves*, 494 U.S. at 69; *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991). Here, the notes explicitly stated "For being a Limited Investor in the amount of . . . ." (Finkel Dec., Ex. 52). Consequently, the investors reasonably expected the notes to be a security.

        iv.      Existence of Risk Reducing Factors

Here, no factors are present that reduce the risk of investment.  Medical Disposal's notes were not insured or collateralized, and there was no other regulatory scheme to protect the investors.  Thus, this factor also favors treating the notes as securities.[5]

        b.      In the Alternative, the Seven Instruments Sold to Investors Are Investment Contracts

Alternatively, the seven investments are investment contracts under *Howey* because they satisfy *Howey's* three-prong test discussed above.  First, the investments were an investment of money with the expectation of profit because the five investors

---

[5]     Finally, although Section 3(a)(3) of the Securities Act, 15 U.S.C. § 77c(a)(3), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), provide an exemption for notes with a maturity of under nine months, the Supreme Court in *Reves* did not preclude such notes from being securities.  *Reves*, 494 U.S. at 71.  Moreover, courts have held that because of the legislative history of the Securities Act and the language of "unless the context otherwise requires" in Section 3(a) of the Exchange Act, 15 U.S.C. § 78c(a), the statutes are not to be read literally, and the exemption only applies to "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks."  *SEC v. American Board of Trade, Inc.*, 751 F.2d 529, 538 (2d Cir. 1984) (*citing Zeller v. Bogue Electric Mfg. Corp.*, 476 F.2d 795 (2d Cir. 1973) (citing Securities Act Release No. 33-4412 (1961)).

Securities Act Release No. 33-4412 "emphasizes the prime quality of the paper intended to be exempted and stated that the exempted items are 'composed of assets easily convertible into cash and are comparable to liquid inventories of an industrial or mercantile company.'"  *Sanders v. John Nuveen & Co. Inc.*, 463 F.2d 1075, 1079 n.12 (7th Cir. 1972) (quoting Securities Act Release No. 33-4412 (1961)).  Moreover, where "a prospective borrower approaches a bank for a loan and gives his note in consideration for it, the bank has purchased commercial paper.  But a person who seeks to invest his money and receives a note in return for it has not purchased commercial paper in the usual sense. He has purchased a security investment."  *Id.* at 1080.  Here, the notes Medical Disposal sold to investors were not easily convertible into cash and were not comparable to liquid inventories of an industrial company.

paid $64,500 to Medical Disposal purportedly to facilitate Waste Management's acquisition of Medical Disposal in return for high interest rates to be paid over a short period of time.  Second, there is horizontal commonality because the funds were pooled together to pay for expenses needed to consummate Waste Management's purported acquisition of Medical Disposal, and investors' profits were dependent on the success of this acquisition.  Third, the profits were to come solely from the efforts of others because Medical Disposal's management would finalize the acquisition without investors' participation.  Finally, the Supreme Court in *Edwards* ruled that promises of fixed returns do not fail the third *Howey* test if the investors are attracted by representations of investment income, i.e. seeking a return on their investment. 124 S. Ct. at 894. Therefore, the instruments are investment contracts and thus securities.

**B.**    **The Defendants Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the offer, purchase or sale of a security.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988) (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (*en banc*), *cert. denied*, 394 U.S. 976 (1969)); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1466 (2d Cir.1996); *S.E.C. v. Prater*, 289 F. Supp. 2d 39, 52 (D. Conn. 2003).  In order to prove a violation of the antifraud provisions, the Commission must show:  (1) misrepresentations or omissions regarding material facts, or other fraudulent conduct; (2) made in the offer or sale, or in connection with the purchase or sale, of a security; and (3) the defendants acted with scienter.  *Basic*, 485 U.S. at 235

n.13.  Misrepresentations and omissions must be material to be actionable under the antifraud provisions.  *Id.* at 231.  Information is considered material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision or if the information would significantly alter the total mix of available information.  *Id.* at 231-32.

To establish liability for violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, it must be shown that the defendant acted with scienter.[6]  *Ernst & Ernst v. Hochfelder, et al.*, 425 U.S. 185, 201 (1976).  The Second Circuit has held that knowing or reckless conduct generally satisfies the scienter requirement.  *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998), *cert. denied*, 119 S. Ct. 1755 (1999).

The "in" and "in connection with" elements "must be read flexibly, not technically and restrictively" in order for the antifraud provisions to cover typical and novel forms of fraud.  *See In re Ames Dept. Stores Inc. Stock Litigation*, 991 F.2d 953, 964 (2d Cir. 1993) (internal quotation marks omitted).  To satisfy the "in" and "in connection with" element, a party must show that "a security buyer or seller suffer[ed] an injury as a result of deceptive practices 'touching' its purchase or sale of securities."  *Id. See SEC v. Zandford,* 535 U.S. 813, 122 S. Ct. 1899, 1904 (2002) ("It is enough that the scheme to defraud and the sale of securities coincide.").

As described above, Medical Disposal, LaTouche and Cartelli made numerous false and misleading statements of material fact when they solicited individuals to invest

---

[6]    Negligent conduct is sufficient to establish violations of Section 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).  *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980).

in Medical Disposal.  Cartelli drafted, and Cartelli and LaTouche distributed to investors,

Medical Disposal's brochure falsely claiming that the FDA approved the Needlyzer.

Between January 1997 and July 2000, LaTouche and Cartelli also met personally with

investors and falsely told them that: (i) Medical Disposal had negotiated contracts with

foreign companies to purchase the Needlyzer; (ii) Medical Disposal would use investor

funds to manufacture the Needlyzer; and (iii) "a company in New York" was

manufacturing Needlyzers for Medical Disposal.  LaTouche and Cartelli also falsely told

investors Medical Disposal owned the patent rights for the Needlyzer.  Between April

1998 and October 1999, Cartelli and LaTouche drafted, and LaTouche sent, investor

newsletters falsely describing Medical Disposal's sales of Needlyzer units to foreign

companies.  Finally, Cartelli falsely told LaTouche that Medical Disposal was going to be

acquired for $100 million dollars, and LaTouche then told investors this fabricated story.

### 1.    The Misrepresentations And Omissions Made By The Defendants Were Material

A material fact is one that a reasonable investor would consider significant in

deciding whether to buy or sell securities.  *Basic*, 485 U.S. at 231-32.  A reasonable

investor would consider the Defendants' false representations that the FDA approved the

Needlyzer significant.  *SEC v. Schiffer*, 1998 U.S. Dist. Lexis 8579, *10 (S.D.N.Y. 1998)

(misrepresentations regarding the status of FDA approval for the company's sole product

are material).  Medical Disposal's and LaTouche's false representation that Medical

Disposal owned the patent rights for the Needlyzer was similarly material.  *Research

Automation*, 585 F.2d at 34-36 (investor letter that stated "patent applied for" on top of

picture of item, even though patent application was rejected was a material

misrepresentation).  The Defendants' misrepresentations that Medical Disposal had

contracts with companies in foreign countries to purchase thousands of devices was

material. *Id.* (finding that defendant's representation that it had a binding contract for machinery when no such contract existed was a material misrepresentation). Similarly, the Defendants' claims that Medical Disposal would use investor proceeds to manufacture Needlyzers, and a company was actually manufacturing the Needlyzer, were material. *SEC v. Coates*, 137 F. Supp. 2d 413, 426 (S.D.N.Y. 2001) (representations to investors that a company has firm orders for its products, and omissions regarding the company's inability to manufacture its products or sell them commercially is material). Finally, the Defendants' false claim that Waste Management offered to acquire Medical Disposal for $100 million was material. *Blasdel v. Mullenix*, 356 F. Supp. 924, 925 (W.D. Okla. 1971)(false merger announcement was material misstatement).

##### 2.     The Defendants Acted With Scienter

###### a.     LaTouche Purposely or At the Least Recklessly Deceived Investors

LaTouche, Medical Disposal's President, acted with scienter. On numerous occasions, LaTouche intentionally deceived investors. For instance, LaTouche distributed to investors Medical Disposal's brochure stating that the FDA approved the Needlyzer and he told investors that the Needlyzer was FDA approved. (St. §§ 83, 88). LaTouche, however, knew the FDA had not approved the Needlyzer. Brian LaTouche told LaTouche on different occasions that the Needlyzer was not FDA approved, and LaTouche's early attempts to sell the Needlyzer were unsuccessful because the Needlyzer did not have FDA approval. (St. §§ 14, 51, 57-58, 67). LaTouche also told investors that Medical Disposal owned the patent rights to the Needlyzer. (St. § 89). LaTouche knew this was false because Brian LaTouche had told LaTouche that the status of the Needlyzer patent ownership was unclear. (St. §§ 50-51, 56). LaTouche also acted

recklessly when he made a number of false claims to investors. For instance, although Cartelli told LaTouche that Dayton Brown was manufacturing the Needlyzer, and Medical Disposal had numerous contracts to sell the Needlyzer, LaTouche made absolutely no efforts to verify these claims before he told investors this information. (St. §§ 91-92). LaTouche did not contact anyone from the companies who purportedly purchased or were interested in purchasing the Needlyzer, and did not see any written agreements for the purchase of Needlyzers. (St. §§ 131-137). A minimum amount of due diligence would have demonstrated that the claims were blatantly false. Moreover, Brian LaTouche warned LaTouche that Cartelli's claims of large deals were not true, and LaTouche admitted that he began having doubts about the veracity of Cartelli's statements around August 1999. (St. §§ 122-123, 158). Finally, LaTouche never spoke to Faber or any representative of the Gottesman Company to verify whether Waste Management was acquiring Medical Disposal before LaTouche informed investors of this information. (St. § 169).

        b.    <u>Cartelli Purposely or At the Least Recklessly Deceived Investors</u>

Cartelli also acted with scienter. Cartelli knowingly made false claims to investors. For instance, Cartelli participated in drafting, and instructed Mackin and other Global Telecom Services employees to draft, Medical Disposal's brochure that falsely claimed that the FDA approved the Needlyzer. (St. §§ 70-74). Cartelli also told investors that the Needlyzer was FDA approved and that Medical Disposal owned the patent rights to the Needlyzer. (St. §§ 95-96). Cartelli knew this was false because his attempts to sell the Needlyzer in 1994 were unsuccessful because the Needlyzer was not FDA approved, and Scafidi told Cartelli in 1997 that Dayton Brown would not consider manufacturing

the Needlyzer until after Medical Disposal obtained the patent rights for the Needlyzer and got FDA approval. (St. §§ 14, 36). Further, Cartelli told investors that their funds would be used to manufacture the Needlyzer. (St. § 93). Despite Cartelli's claims to investors, Dayton Brown never manufactured the Needlyzer and no other company agreed to manufacture the Needlyzer for Medical Disposal. (St. §§ 40-42). Moreover, Cartelli controlled Medical Disposal's bank accounts and used large sums for personal expenses. (St. §§ 173-180). Therefore, he knew that investors' funds were not used to manufacture the Needlyzer.

Cartelli also knowingly, or at the least recklessly, misrepresented to investors that the Vatican endorsed the Needlyzer. Cartelli purportedly obtained a letter from Archbishop Grocholewski that stated, in part: "[w]e will give you the support that you require to sell this product of safety [Needlyzer] to all interested Healthcare Facilities under the Vatican jurisdiction." (St. §§ 108-109). The letter, however, was a forgery. (St. § 110). Moreover, even if Cartelli initially believed that the letter from the Vatican was authentic, Scafidi told him that it was not and, shortly thereafter, Cartelli admitted to Scafidi that the letter was not authentic. (St. §§ 120-121).

Cartelli also knew that Medical Disposal did not enter into contracts with foreign companies to purchase Needlyzers. Cartelli was the only Medical Disposal partner who had direct contact with the foreign companies. (St. §§ 131-137). However, there were no contracts with foreign companies. (St. §§ 107). Yet, Cartelli still told investors about firm contracts for the purchase of the Needlyzer and gave LaTouche false information to include in the investor newsletters. (St. §§ 104, 129).

c.    LaTouche and Cartelli's Fifth Amendment Assertion

As noted above, Cartelli's and LaTouche's assertion of their privilege against self-incrimination further enhances the overwhelming evidence that they violated the federal securities laws.  LaTouche and Cartelli each asserted their Fifth Amendment privilege regarding all matters concerning Medical Disposal and the Needlyzer, including all communications made to Medical Disposal investors, and all knowledge LaTouche and Cartelli had concerning the Needlyzer. (Finkel Dec., Exs. 9 at § 3, 11 at § 3). Accordingly, the Court should draw an inference that LaTouche and Cartelli acted with scienter.

d.    Medical Disposal

Due to LaTouche's position as Medical Disposal's President, LaTouche's scienter is imputed to Medical Disposal. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 811-13 (2d Cir. 1975) (affirming an antifraud injunction against a company based on the conduct of an officer acting within the scope of his authority); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (the knowledge of individuals who exercise substantial control over a corporation's operation is properly imputed to the corporation); *SEC v. Rogers*, 790 F.2d 1450, 1458 (9th Cir. 1986) (corporate defendants do not possess a "mental state," and the securities laws establish scienter by imputing the state of mind of their agents to them).  Thus, Medical Disposal acted with scienter.

**3.    "In The Offer or Sale" and "In Connection With the Purchase Or Sale" Requirements**

Medical Disposal, LaTouche and Cartelli made false and misleading statements about Medical Disposal and the Needlyzer to induce the investors to purchase securities.

Therefore, the "in" and "in connection with" requirements are satisfied.  *See Ames Dept.*

*Stores Inc.*, 991 F.2d at 967 (misrepresentations to investors made in press releases,

annual reports and SEC filings satisfy the "in connection" requirement).

## II.

### The Court Should Grant The Commission Summary Judgment Against The Defendants On All Relief Demanded In The Complaint

**A.    The Defendants Should Be Permanently Enjoined From Future Violations Of The Federal Securities Laws**

Permanent injunctions against future violations of the securities laws may be

granted on a motion for summary judgment.  *SEC v. Electronics Warehouse, Inc.,* 689 F.

Supp. 53, 58)(D. Conn. 1988), *aff'd, SEC v. Calvo*, 891 F.2d 457 (2d Cir. 1989);

*Research Automation*, 585 F.2d at 36 (2d Cir. 1978)("even in suits for injunctive relief,

the district courts should not hesitate to grant a plaintiff's request for summary judgment

when the defendant has failed to meet the requirements prescribed by Rule 56(e)"); *SEC*

*v. Cantor*, 948 F. Supp. 312 (S.D.N.Y. 1996)(Court granted Commission's motion for

summary judgment and entered an order permanently enjoining defendant from future

violations of the federal securities laws, requiring defendant to disgorge his ill-gotten

gains plus prejudgment interest, and requiring defendant to pay civil penalties).  In

deciding whether to issue an injunction, courts seek to determine whether there is a

reasonable likelihood that the defendants, if not enjoined, will engage in future illegal

conduct.  *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, 469 U.S. 1034

(1984); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 100 (2d Cir.

1978)).

The Defendants' violations were egregious. LaTouche and Cartelli made materially false statements to investors for over three years about virtually every aspect of Medical Disposal's operations, including the FDA's purported approval of the Needlyzer, Medical Disposal's purported ability to manufacture the Needlyzer, and Medical Disposal's purported sales of the Needlyzer. Moreover, LaTouche and Cartelli personally profited from the fraud. Cartelli used at least $314,000 of investors' funds for his personal use, including paying for bills and his son's college tuition. LaTouche also used investor funds for his personal use. The Defendants will have ample opportunity to violate the securities laws in the future, and therefore should be enjoined.

**B.    The Defendants Should Disgorge Their Ill-Gotten Gains**

A federal district court's authority to order disgorgement in a Commission enforcement action is well established. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illegal profits). Disgorgement as an equitable remedy is designed to compel defendants to "give up the amount by which [they] were unjustly enriched." *SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir. 1987). The amount to be disgorged "need only be a reasonable approximation of profits causally connected to the violation" *First Jersey Secs.,* 101 F.3d at 1475. Such amount, however, need not be figured with perfect precision; "disgorgement need only be a reasonable approximation of profits causally related to the violation." *Id*. All doubts concerning the disgorgement determination must be resolved against the defendant. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996).

35

Disgorgement is warranted here against the Defendants jointly, because they profited from receiving proceeds of their fraud.  Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for disgorgement of illegally obtained proceeds.  *First Jersey Secs.*, 101 F.3d at 1475-76 (citing *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993)).  The Defendants fraudulently raised $742,000 from investors.[7]  The Court should order the Defendants to pay on a joint and several basis, disgorgement of $742,000, plus prejudgment interest of $189,369.30, for a total of $931,369.30, to deprive them of the benefits of their illegal conduct.[8]  *First Jersey Secs,* 101 F.3d at 1476 ("The decision whether to grant  prejudgment  interest and the rate used if such interest is granted are matters confided to the district court's broad discretion.") (citation omitted).

**C.    The Court Should Assess Civil Penalties Against The Defendants**

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), authorize district courts to assess civil penalties against persons who violate the Securities Act or the Exchange Act.  These provisions indicate that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances."

---

[7]    The Commission calculated this figure based on the total number of investment contracts and notes sold. Moreover, the Defendants stipulated that the company raised $742,000.  (Finkel Dec., Ex. 4 at § 39).

[8]    To calculate prejudgment interest, the Commission staff used the rate of interest used by the Internal Revenue Service in computing interest due on tax underpayments and refunds, which is designed to reflect market conditions. *First Jersey Secs.*, 101 F. 3d at 1476.  This rate has been adopted by the Commission in administrative proceedings. 17 C.F.R. § 201.600(b).

Penalties for <u>each</u> violation are specified by three ranges of severity.  The Defendant's violations fit the third, most severe penalty category, which applies when a defendant's conduct involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] resulted in substantial losses or created a significant risk of substantial losses to other persons."  The third tier penalty provisions specify penalties of up to the <u>greater</u> of $120,000 for a natural person, $600,000 for any other person, or the amount of the defendant's pecuniary gain.  Given the flagrant misrepresentations made by the Defendants, the egregiousness of their conduct and the significant harm caused to investors, the court should award Tier III penalties.  Accordingly, the Court should assess maximum civil penalties against <u>each</u> defendant.[9]

**D.    <u>The Court Should Permanently Bar LaTouche and Cartelli From Serving As Officers Or Directors of Publicly Held Companies</u>**

Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), provide that the court may bar or suspend a person from serving as an officer or director of public companies if the person violated the antifraud provisions and displays "unfitness to serve as an officer or director."[10]  In *SEC*

---

[9]    Maximum civil penalties can be calculated in different ways.  One calculation is for the civil penalty to equal the total amount of ill-gotten gain raised by the Defendants (e.g. $742,000).  Another method is for the Court to multiply the number of violations by the maximum amount per violation (e.g. $120,000 for an individual).  Each separate misrepresentation to investors can be considered a separate violation

[10]    Prior to the passage of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, the standard for barring an individual from serving as an officer or director of a public company was "substantial unfitness."  Section 305(a) of the Sarbanes-Oxley Act of 2002 has amended Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), to require only a showing of "unfitness" to serve as an officer or director of a public company in order for a court to order a bar.  By their conduct, LaTouche and Cartelli should be barred even under the earlier more stringent standard of "substantial unfitness."

*v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995), the Court listed six factors to consider when resolving the issue of substantial unfitness: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Id.*

LaTouche and Cartelli engaged in an egregious fraud with scienter. For over three years, LaTouche served as Medical Disposal's President, and he knowingly made numerous false representations to solicit investors. After LaTouche secured numerous investors, LaTouche used the proceeds of the fraud for personal uses, and to operate Global Telecom's other business, selling "900" telephone numbers. LaTouche is simply unfit to act as a fiduciary and serve as an officer or director of any public company.

Cartelli is also unfit to serve as an officer or director. Although he was not a named officer of Medical Disposal, Cartelli was LaTouche's partner at Medical Disposal, and he acted as a *de facto* officer. For instance, he and LaTouche jointly controlled Medical Disposal's finances, and they controlled access to its bank accounts. Cartelli ran and operated Medical Disposal's Needlyzer business and negotiated all the purported contracts with Needlyzer purchasers. Cartelli knowingly made false representations to investors, and drafted the Needlyzer's brochure that contained false statements. Moreover, he fabricated the story of Waste Management's purported plans to acquire Medical Disposal. Finally, Cartelli used investor proceeds for his personal uses, such as hiring personal assistants for the "900" telephone business, including his girlfriend, Mackin, and making payments to his son.

## CONCLUSION

For the reasons stated, the Commission respectfully requests that the Court grant summary judgment on all claims against Medical Disposal, LaTouche and Cartelli in all respects and issue a final judgment.


Dated:  New York, New York
        _____, 2004

                                    _____
                                    WILLIAM FINKEL
                                    Federal Bar Council No. CT-24904
                                    Attorney for Plaintiff
                                    Securities and Exchange Commission
                                    233 Broadway
                                    New York, New York 10279
                                    (646) 428-1716
                                    (646) 428-1977 (fax)