UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____ :
                                                :
SECURITIES AND EXCHANGE COMMISSION,             :
                                                :    3:03 CV 418 (PCD)
                               Plaintiff,        :
                                                :
                                                :    LOCAL RULE
                v.                              :    56(a)(1)
                                                :    STATEMENT
GLOBAL TELECOM SERVICES L.L.C. d/b/a            :    OF UNDISPUTED
MEDICAL DISPOSAL DEVICES,                       :    FACTS IN
ALBERT D. LATOUCHE and SALVATORE J.             :    SUPPORT OF
CARTELLI, JR.,                                  :    MOTION FOR
                                                :    SUMMARY
                               Defendants.       :    JUDGMENT
_____ :

        Plaintiff Securities and Exchange Commission (the "Commission"), in

accordance with Local Civil Rule 56(a)(1), submits the following statement of facts as to

which there is no genuine issues to be tried in support of its Motion for Summary

Judgment against Defendants Global Telecom Services, LLC d/b/a Medical Disposal

Devices ("Medical Disposal"), Albert D. LaTouche ("LaTouche") and Salvatore J.

Cartelli, Jr. ("Cartelli").

A.    **Background**

    1.    LaTouche is 67 years old and since 1992, resides in Haddam, Connecticut.

(Finkel Dec., Ex. 4 at §§ 5, 6).

    2.    Cartelli is 53 years old and since 2001, resides in Portland, Connecticut.

(Finkel Dec., Ex. 4 at §§ 8, 9).

    3.    In the early 1990's, Bob Hall manufactured the Needlyzer.  (Finkel Dec., Ex.

15 at 19).

4.      LaTouche learned about the Needlyzer in the early 1990's from Brian LaTouche.  (Finkel Dec., Ex. 10 at 11).

5.      Medical Disposal claimed that the Needlyzer is a device which destroyed hypodermic needles safely.  (Finkel Dec., Ex. 4 at § 12).

6.      Medical Disposal's slogan for the Needlyzer was "Don't get stuck with someone else's problem."  (Finkel Dec., Ex. 4 at § 11).

7.       In or around 1992, LaTouche's brother, Brian LaTouche, entered into a contract with Bob Hall for the rights to market and sell the Needlyzer in Tennessee and other areas. (Finkel Dec., Ex. 15 at 10, 15).

8.      In 1993 or 1994, LaTouche signed a contract with Brian LaTouche for the rights to market and sell Needlyzers in the New England area.  (Finkel Dec., Ex. 10 at 12-14).

9.      In or around 1994, LaTouche asked Cartelli, a car salesman, to help him sell the Needlyzer and manage Medical Disposal's business.  (Finkel Dec., Exs. 10 at 17-18; 15 at 18; 18 at 16).

10.     In early 1994, Cartelli asked his friend Joseph A. Scafidi ("Scafidi") to assist him with selling and marketing the Needlyzer.  (Finkel Dec., Ex. 18 at 16).

11.     Cartelli told Scafidi that the Needlyzer was in the process of receiving Food and Drug Administration ("FDA") approval.  (Finkel Dec., Ex. 18 at 24-25).

12.     Scafidi worked with Cartelli to sell the Needlyzer between September and December 1994.  (Finkel Dec., Ex. 18 at 30).

13.     In 1994, Cartelli and Scafidi tried to sell the Needlyzer by demonstrating its use at hospitals and healthcare companies.  (Finkel Dec., Ex. 18 at 16).

14.    Since the FDA had not approved the use of the Needlyzer, no hospital, healthcare company or other entity placed any purchase orders with LaTouche, Cartelli or Scafidi.  (Finkel Dec., Ex. 18 at 31-32).

15.    Between 1992 and 1994, LaTouche unsuccessfully attempted to sell the Needlyzer in the New England area.  (Finkel Dec., Ex. 15 at 18).

16.    Brian LaTouche filed a lawsuit against Bob Hall's company, Healthcare Products Plus, Inc. in April 1994.  (Finkel Dec., Ex. 20).

17.    As the result of a lawsuit between Brian LaTouche and Bob Hall, the manufacturer of the Needlyzer, Brian LaTouche could no longer supply LaTouche with demonstration Needlyzers.  (Finkel Dec., Ex. 15 at 31-32).

18.     LaTouche temporarily ceased his efforts to sell the Needlyzer.  (Finkel Dec., Ex. 15 at 32).

**B.    LaTouche and Cartelli Attempted to Manufacture and Sell the Needlyzer**

19.    In approximately 1996, LaTouche and Cartelli agreed to attempt to manufacture and sell the Needlyzer.  (Finkel Dec., Exs. 4 at § 10; 15 at 33; 18 at 49-50).

20.    Global Telecom Services, LLC, is a Connecticut company that claimed to have two lines of business.  (Finkel Dec., Ex. 4 at §§ 1, 2).

21.    Since December 1995, LaTouche has been the President of Global Telecom Services, LLC.  (Finkel Dec., Ex. 4 at § 7).

22.    In one of its businesses, Global Telecom Services, LLC purportedly sold "900" telephone numbers.  (Finkel Dec., Ex. 4 at § 4).

23.    In one of its businesses, Global Telecom Services, LLC d/b/a Medical Disposal purported to manufacture and sell the Needlyzer.  (Finkel Dec., Ex. 4 at § 3).

24.    Cartelli worked as LaTouche's partner at Medical Disposal.  (Finkel Dec., Ex. 10 at 29).

25.    Cartelli managed and was in charge of Medical Disposal's business.  (Finkel Dec., Exs. 10 at 30; 17 at 16; 18 at 48).

### 1.    LaTouche and Cartelli Did Not Manufacture the Needlyzer

26.    Medical Disposal planned to retain a company in New York to manufacture the Needlyzer.  (Finkel Dec., Ex. 4 at § 14).

27.    In or around 1996, LaTouche and Cartelli asked Scafidi if Dayton T. Brown, Inc., ("Dayton Brown"), the company where Scafidi worked, was interested in manufacturing the Needlyzer after Medical Disposal obtained the patent rights and FDA approval for the Needlyzer.  (Finkel Dec., Ex. 18 at 49-50).

28.    In or around the summer of 1997, LaTouche and Cartelli went to Dayton Brown to discuss with Scafidi the possibility of Dayton Brown manufacturing the Needlyzer for Medical Disposal.  (Finkel Dec., Ex. 18 at 53).

29.    Scafidi told LaTouche and Cartelli that he needed approval from Dayton Brown's board of directors prior to Dayton Brown agreeing to manufacture the Needlyzer for Medical Disposal.  (Finkel Dec., Ex. 18 at 54).

30.    Scafidi presented the idea that Dayton Brown manufacture the Needlyzer to Medical Disposal to Dayton Brown's Board of Directors.  (Finkel Dec., Ex. 18 at 54-55).

31.    Dayton Brown never entered into a contract with Medical Disposal to manufacture the Needlyzer.  (Finkel Dec., Ex. 18 at 58).

32.    Dayton Brown's Board of Directors told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must obtain FDA approval for the

Needlyzer.  (Finkel Dec., Ex. 18 at 55-56).

33.    Dayton Brown's Board of Directors told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must acquire the patent rights for the Needlyzer.  (Finkel Dec., Ex. 18 at 55-56).

34.    Dayton Brown's Board of Directors told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must supply the Needlyzer parts.  (Finkel Dec., Ex. 18 at 55-56).

35.    Dayton Brown's Board of Directors only said that they would consider manufacturing Needlyzers for Medical Disposal if Medical Disposal met these conditions.  (Finkel Dec., Ex. 18 at 58).

36.    Scafidi told Cartelli that Dayton Brown's Board of Directors told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must acquire the patent rights for the Needlyzer and obtain FDA approval for the Needlyzer.  (Finkel Dec., Ex. 18 at 56-57).

37.    Scafidi told Cartelli that Dayton Brown's Board of Directors told Scafidi that prior to agreeing to manufacture the Needlyzer, Medical Disposal must supply the Needlyzer parts.  (Finkel Dec., Ex. 18 at 56-57).

38.    Scafidi told Cartelli that Dayton Brown's Board of Directors only said that they would consider manufacturing Needlyzers for Medical Disposal if Medical Disposal met these conditions.  (Finkel Dec., Ex. 18 at 58).

39.    After Scafidi told this to Cartelli, Cartelli no longer pursued manufacturing the Needlyzer at Dayton Brown.  (Finkel Dec., Ex. 18 at 57-58).

40.    Medical Disposal never entered into a contract with any company to

manufacture the Needlyzer.  (Finkel Dec., Ex. 4 at § 20).

41.    No company ever manufactured the Needlyzer for Medical Disposal.  (Finkel Dec., Ex. 4 at § 21).

42.    Medical Disposal never built any Needlyzers.  (Finkel Dec., Ex. 4 at § 13).

### 2.    LaTouche and Cartelli Did Not Acquire Patent Rights For the Needlyzer

43.    Between December 1996 and September 1997, Medical Disposal attempted to purchase the patent rights for the Needlyzer.  (Finkel Dec., Ex. 19 at 10, 15-16).

44.    Scafidi referred Cartelli to Robert Faber ("Faber"), a patent attorney, to assist Medical Disposal with acquiring the Needlyzer patent.  (Finkel Dec., Ex. 18 at 50).

45.    On or about December 19, 1996, Cartelli retained Robert Faber to purchase the patent rights for the Needlyzer.  (Finkel Dec., Exs. 19 at 10; 21).

46.    Faber last represented Cartelli in September 1997.  (Finkel Dec., Ex. 19 at 15-16).

47.    Cartelli did not acquire the patent rights for the Needlyzer as of September 1997.  (Finkel Dec., Ex. 19 at 16).

48.    Medical Disposal never acquired the patent rights for the Needlyzer.  (Finkel Dec., Ex. 4 at § 31).

49.    Cartelli told Scafidi that he was unsuccessful in obtaining the patent rights for the Needlyzer.  (Finkel Dec., Ex. 18 at 52).

### 3.    LaTouche Discussed FDA Approval and Patent Rights with Brian LaTouche

50.    LaTouche knew that Medical Disposal never acquired the patent rights for the Needlyzer.  (Finkel Dec., Ex. 10 at 58).

51.    Brian LaTouche discussed with LaTouche that it was unclear who owned the Needlyzer patent.  (Finkel Dec., Ex. 15 at 47).

52.    In November and December 1996, LaTouche discussed with Brian LaTouche the marketing rights and FDA approval of the Needlyzer.  (Finkel Dec., Exs. 15 at 38; 26).

53.    In or around November and December 1996, LaTouche told Brian LaTouche that Scafidi and Cartelli, or their attorneys, signed a contract with the patent owners of the Needlyzer.  (Finkel Dec., Exs. 15 at 38; 26).

54.    On or about December 5, 1996, Brian LaTouche called one of the patent owners of the Needlyzer.  (Finkel Dec., Exs. 15 at 38; 26).

55.    On or about December 5, 1996, the patent owner told Brian LaTouche that there was no contract signed with Cartelli, Scafidi or their attorney.  (Finkel Dec., Exs. 15 at 39; 26).

56.    On or about December 5, 1996, Brian LaTouche told LaTouche that the patent owner told Brian LaTouche that there was no contract signed with Cartelli, Scafidi or their attorney.  (Finkel Dec., Exs. 15 at 40; 26).

57.    Brian LaTouche told LaTouche that the Needlyzer was not approved by the FDA.  (Finkel Dec., Ex. 15 at 24).

58.    In or around November 1994, Brian LaTouche and LaTouche discussed that they were not allowed to sell the Needlyzer as FDA approved.  (Finkel Dec., Exs. 15 at 27-28; 25).

59.    On or about November 26, 1996, LaTouche told Brian LaTouche that Cartelli was planning to meet with John Lucas ("Lucas").  (Finkel Dec., Exs. 15 at 38; 26).

60.    On or about November 26, 1996, LaTouche told Brian LaTouche that Lucas was an FDA official.  (Finkel Dec., Exs. 15 at 38; 26).

61.    On or about November 26, 1996, LaTouche told Brian LaTouche that the purpose of the meeting was to obtain FDA approval for the Needlyzer.  (Finkel Dec., Exs. 15 at 38; 26).

62.    On or about November 26, 1996, LaTouche told Brian LaTouche that the meeting would take place at the FDA official's vacation home.  (Finkel Dec., Exs. 15 at 38; 26).

63.    As a result of his conversation with LaTouche, on or about December 4, 1996, Brian LaTouche called the FDA.  (Finkel Dec., Exs. 15 at 38; 26).

64.    On or about December 4, 1996, an FDA official told Brian LaTouche that there were no pending requests for FDA approval of the Needlyzer.  (Finkel Dec., Exs. 15 at 39; 26).

65.    On or about December 4, 1996, the FDA official told Brian LaTouche that no member of the FDA would meet with someone who is applying for approval.  (Finkel Dec., Exs. 15 at 39; 26).

66.    On or about December 4, 1996, the FDA official told Brian LaTouche that Lucas was not on vacation.  (Finkel Dec., Exs. 15 at 39; 26).

67.    On or about December 4, 1996, Brian LaTouche told LaTouche that an FDA official told Brian LaTouche that there were no pending requests for FDA approval of the Needlyzer.  (Finkel Dec., Exs. 15 at 40, 42; 26).

68.    On or about December 4, 1996, Brian LaTouche told LaTouche that an FDA official told Brian LaTouche that no member of the FDA would meet with someone who

is applying for approval.  (Finkel Dec., Exs. 15 at 40, 42; 26).

69.    On or about December 4, 1996, Brian LaTouche told LaTouche that an FDA official told Brian LaTouche that Lucas was not on vacation.  (Finkel Dec., Exs. 15 at 40-42; 26).

### 4.    Cartelli Created a Brochure for the Needlyzer

70.    Cartelli participated in creating a brochure for Medical Disposal which described the Needlyzer.  (Finkel Dec., Ex. 4 at § 28).

71.    Among other things, Medical Disposal's brochure stated that the Needlyzer was FDA approved.  (Finkel Dec., Exs. 4 at § 29; 7 at § 14; 27).

72.    Cartelli lived with Mary Beth Mackin ("Mackin") and was her supervisor at Global Telecom Services.  (Finkel Dec., Ex. 17 at 30).

73.    In or around late 1997- early 1998, Mackin asked Global Telecom Services' employees to create a brochure for the Needlyzer.  (Finkel Dec., Ex. 17 at 23-24, 33).

74.    Mackin and Cartelli gave Global Telecom Services employees the information to put on the brochure, including "FDA Approval."  (Finkel Dec., Ex. 17 at 24, 30).

75.    The FDA had not approved the Needlyzer.  (Finkel Dec., Ex. 4 at § 15).

## C.    LATOUCHE AND CARTELLI MADE FALSE AND MISLEADING STATEMENTS  TO SOLICIT INVESTORS

### 1.    LaTouche And Cartelli Met With Investors

76.    LaTouche solicited individuals to invest in Medical Disposal.  (Finkel Dec., Exs. 4 at § 16; 7 at §§ 4-5, 9, 12, 13-14).

77.    Cartelli solicited individuals to invest in Medical Disposal.  (Finkel Dec., Ex. 7 at §§ 6-7, 16-17).

78.    At least 47 investors invested in Medical Disposal.  (Finkel Dec., Exs. 30; 31).

79.    The individuals Medical Disposal solicited were friends of LaTouche.  (Finkel Dec., Ex. 10 at 72).

80.    From approximately January 1997 through July 2000, Medical Disposal raised approximately $742,000 from investors.  (Finkel Dec., Ex. 4 at § 39).

81.    LaTouche demonstrated the Needlyzer to investors.  (Finkel Dec., Exs. 5 at § 5; 7 at § 6; 10 at 72; 13 at § 8; 14 at § 5).

82.    Cartelli demonstrated the Needlyzer to one investor.  (Finkel Dec., Ex. 7 at § 6).

83.    LaTouche gave investors a brochure of the Needlyzer.  (Finkel Dec., Exs. 7 at § 6; 10 at 72; 13 at § 8; 14 at § 5).

84.    Cartelli distributed to investors Medical Disposal's brochure describing the Needlyzer.  (Finkel Dec., Exs. 7 at § 6; 10 at 67).

85.    LaTouche told investors that Medical Disposal was raising capital to pay the manufacturing costs of producing the Needlyzer.  (Finkel Dec., Ex. 4 at § 25).

86.    LaTouche told investors that Medical Disposal would use their funds to manufacture Needlyzers.  (Finkel Dec., Ex. 4 at § 26, 14 at § 5).

87.    LaTouche told one investor, Gaetan Roy ("Roy"), that Cartelli was his partner in Medical Disposal.  (Finkel Dec., Ex. 7 at § 5).

88.    LaTouche told Roy that the Needlyzer was FDA approved.  (Finkel Dec., Ex. 7 at § 14).

89.    LaTouche told investors that Medical Disposal acquired the patent rights to the Needlyzer.  (Finkel Dec., Ex. 7 at § 9, 14 at § 7).

90.    LaTouche told investors, including Robert Nettleton ("Nettleton") and Louis

Fabri ("Fabri"), that a company in New York manufactured the Needlyzer for Medical Disposal.  (Finkel Dec., Exs. 4 at § 18; 13 at § 9; 14 at § 6).

91.    Except for one visit to Dayton Brown, LaTouche never spoke to Scafidi about Dayton Brown manufacturing the Needlyzer.  (Finkel Dec., Exs. 10 at 46; 18 at 46, 57).

92.    Cartelli was Medical Disposal's contact person with Scafidi and Dayton Brown.  (Finkel Dec., Exs. 10 at 46; 18 at 71).

93.    Cartelli told investors, including Roy, that Medical Disposal would use investor funds to manufacture Needlyzers.  (Finkel Dec., Ex. 7 at § 21).

94.    At a meeting with Roy where LaTouche was present, Cartelli told Roy that Medical Disposal then currently employed forty-one salesmen to sell the Needlyzer. (Finkel Dec., Ex. 7 at § 7).

95.    At a meeting with Roy where LaTouche was present, Cartelli told Roy that the FDA had approved the Needlyzer.  (Finkel Dec., Ex. 7 at § 7).

96.    At a meeting with Roy where LaTouche was present, Cartelli told Roy that Medical Disposal owned the patent rights to market and build the Needlyzer.  (Finkel Dec., Ex. 7 at § 7).

97.     At a meeting with Roy where LaTouche was present, Cartelli told Roy that Medical Disposal had enough parts stored at a warehouse in Florida to assemble 10,000 Needlyzer units.  (Finkel Dec., Ex. 7 at § 7).

98.    At a meeting with Roy where LaTouche was present, Cartelli told Roy that Pfizer, a large pharmaceutical company, was testing 25 units and might order 200 additional units.  (Finkel Dec., Ex. 7 at § 7).

99.    At a meeting with Roy where LaTouche was present, Cartelli told Roy that

Medical Disposal had an agreement with a company, Dayton Brown, that would begin manufacturing Needlyzers once Medical Disposal had orders for Needlyzers.  (Finkel Dec., Ex. 7 at § 7).

100.    LaTouche and Cartelli attended investor meetings. (Finkel Dec., Ex. 7 at § 5, 21).

101.    In or around 1998, LaTouche and Cartelli held a meeting for approximately 10 persons who invested in Medical Disposal, including Roy and Raymond Flavell ("Flavell").  (Finkel Dec., Ex. 7 at § 21).

102.    During this meeting, Cartelli said that he ran Medical Disposal's business. (Finkel Dec., Ex. 7 at § 21).

103.    During this meeting, Cartelli also said that it was expensive to run Medical Disposal's business and that the investors' funds were used to run Medical Disposal's business.  (Finkel Dec., Ex. 7 at § 21).

104.    During this meeting, Cartelli also said that Medical Disposal had negotiated several deals with foreign companies to purchase Needlyzers.  (Finkel Dec., Ex. 7 at § 21).

**2.    LaTouche And Cartelli Falsely Told Investors About Contracts With Foreign Companies**

105.    LaTouche told investors that Medical Disposal had negotiated contracts with foreign companies to purchase the Needlyzer.  (Finkel Dec., Ex. 4 at § 22).

106.    In approximately August 1999, LaTouche told one investor that Medical Disposal had large orders for the Needlyzer from companies in India and England.  (Ex. 14 at § 5).

107.    No company ever entered into a contract to purchase Needlyzers from

Medical Disposal.  (Finkel Dec., Ex. 4 at § 24).

### 3.    LaTouche And Cartelli Falsely Told Investors About Deals With The Vatican And Italian Companies

108.    Cartelli gave LaTouche a letter purportedly from Archbishop Zenon Grocholewski ("Grocholewski") to Cartelli using the Vatican's letterhead (the "Vatican Letter").  (Finkel Dec., Ex. 10 at 113, 115).

109.    The Vatican Letter stated, in part: "[w]e will give you the support that you require to sell this product of safety [Needlyzer] to all interested Healthcare Facilities under the Vatican jurisdiction."  (Finkel Dec., Ex. 28).

110.    The Vatican Letter was a forgery.  (Finkel Dec., Ex. 8 at § 4).

111.    The signature appearing on the Vatican Letter is a forgery.  Grocholewski did not sign the letter.  (Finkel Dec., Ex. 8 at § 9).

112.    Grocholewski did not draft or assist in drafting the Vatican Letter.  (Finkel Dec., Ex. 8 at § 5).

113.    Prior to May 2002, Grocholewski had never seen the Vatican letter.  (Finkel Dec., Ex. 8 at § 5).

114.    Prior to May 2002, Grocholewski never heard of Cartelli.  (Finkel Dec., Ex. 8 at § 6).

115.    Prior to May 2002, Grocholewski had never heard of: 1) the Medical Disposal Device; 2) any company called Medical Disposal Devices; or 3) the Needlyzer.  (Finkel Dec., Ex. 8 at § 7).

116.    Grocholewski never, either individually or as a representative of the Vatican, supported or agreed to support the Medical Disposal Device or anything else relating in

any way to Cartelli.  (Finkel Dec., Ex. 8 at § 8).

117.    As an Archbishop, Grocholewski never used stationary with the Papal Coat of Arms letterhead.  (Finkel Dec., Ex. 8 at § 10).

118.    In or around February 1998, Cartelli showed the letter from the Vatican to Scafidi.  (Finkel Dec., Ex. 18 at 68, 28).

119.    Scafidi expressed skepticism regarding the Vatican letter to Cartelli.  (Finkel Dec., Ex. 18 at 70).

120.    Scafidi told Cartelli that a friend of his contacted the Vatican and confirmed that the letter was a fake.  (Finkel Dec., Ex. 18 at 65).

121.    Several weeks later, Cartelli told Scafidi that the Vatican letter indeed was a fake.  (Finkel Dec., Ex. 18 at 66).

122.    Brian LaTouche told LaTouche that LaTouche should not believe Cartelli's stories of deals with foreign companies, such as deals with an Italian company.  (Finkel Dec., Ex. 15 at 35-36).

123.    Brian LaTouche told LaTouche that the pending deals Cartelli told LaTouche about were "bogus."  (Finkel Dec., Ex. 15 at 35).

124.    LaTouche gave investors, such as Roy and Fabri, a copy of the Vatican Letter, which he said was from the Vatican.  (Finkel Dec., Exs. 7 at § 18; 14 at § 6).

125.    Cartelli told Roy about pending agreements with foreign companies and the Vatican.  (Finkel Dec., Ex. 7 at § 17).

126.    Cartelli told Roy that he expected orders for tens of thousands of Needlyzer units.  (Finkel Dec., Ex. 7 at § 17).

127.    Cartelli told Roy that the Needlyzer's manufacturer "figures in three months

we'll be putting 10,000 units out the door" and that "a thousand [Needlyzers] for Guatemala at least, and about 10,000 or about 9-10,000 for the Vatican." (Finkel Dec., Ex. 7 at Ex. 9).

     **4.**     **The Defendants Sent Newsletters to Investors Containing Materially False And Misleading Statements**

128.    Between April 1998 and October 1999, LaTouche edited and sent monthly newsletters to investors. (Finkel Dec., Ex. 4 at § 34).

129.    LaTouche edited monthly newsletters to investors based on information that Cartelli provided to LaTouche. (Finkel Dec., Exs. 4 at § 35; 10 at 110-111; 12 at 177-178).

130.    The newsletters described Medical Disposal's efforts to sell the Needlyzer, including contracts and pending deals with foreign entities, including, but not limited to companies in England, Guatemala and India. (Finkel Dec., Exs. 7 at Ex. 11; 13 at Ex. 3; 14 at Exs. 4, 6).

131.    LaTouche did not call the companies listed in the investor newsletters to verify any of the information contained in the investor newsletters. (Finkel Dec., Ex. 10 at 122).

132.    Except for one time where LaTouche traveled to Guatemala, Cartelli was the only partner at Medical Disposal who purportedly contacted any company in Guatemala. (Finkel Dec., Ex. 10 at 116).

133.    LaTouche never saw any written agreement from any company in Guatemala. (Finkel Dec., Ex. 10 at 117).

134.    Cartelli was the only partner at Medical Disposal who purportedly contacted companies in Italy. (Finkel Dec., Ex. 10 at 114).

135.    LaTouche did not see any written agreements with any company in Italy. (Finkel Dec., Ex. 10 at 114).

136.    Cartelli was the only partner at Medical Disposal who purportedly contacted any company in India.  (Finkel Dec., Ex. 10 at 131-132).

137.    LaTouche did not see any written agreements with any Indian company. (Finkel Dec., Ex. 10 at 136).

> a.    <u>There Were No Agreements to Sell the Needlyzer in Hawaii</u>

138.    Siddiqui owns and operates Amro-Asian Trade, Inc. ("Amro-Asian"), an export and import business, located in Honolulu, Hawaii.  (Finkel Dec., Ex. 5 at § 2).

139.    Between June and August 1998, Mahbub A. Siddiqui ("Siddiqui") communicated with Cartelli.  (Finkel Dec., Ex. 5 at § 6).

140.    During these communications, Siddiqui discussed with Cartelli the possibility of selling Needlyzers to distributors in Bangladesh and Hawaii.  (Finkel Dec., Ex. 5 at § 7).

141.    The communications between Cartelli and Siddiqui were preliminary and not detailed.  (Finkel Dec., Ex. 5 at § 7).

142.    At no time did Amro-Asian or Siddiqui enter into any agreement with Medical Disposal or Cartelli to purchase, sell or distribute Needlyzers.  (Finkel Dec., Ex. 5 at § 8).

143.    An investor newsletter dated August 26, 1998, states in part: "Mr[.] Siddiqui from Hawaii is to handle Bangladesh, and is waiting for an evaluation of the product, to see if its affordable in that country."  (Finkel Dec., Ex. 5 at § 9).

144.    At no time did Amro-Asian or Siddiqui agree to "handle" Bangladesh for Cartelli or Medical Disposal.  (Finkel Dec., Ex. 5 at § 10).

145.    As of August 26, 1998, Siddiqui already told Cartelli that the price Medical Disposal was seeking to charge was too high, and that Siddiqui was no longer waiting for a market evaluation of his product.  (Finkel Dec., Ex. 5 at § 10).

146.    The fourth paragraph of the August 26, 1998 investor newsletter also states "[Siddiqui] has also expressed and [sic] interest in pursuing this in eight other countries." (Finkel Dec., Ex. 5 at § 11).

147.    At no time did Amro-Asian or Siddiqui discuss with Cartelli or Medical Disposal the purchase, sale or distribution of the Needlyzer in eight other countries. (Finkel Dec., Ex. 5 at § 11).

148.    Siddiqui only had preliminary discussions with Cartelli regarding the possibility of selling the Needlyzer in Bangladesh, Hawaii and other U.S. territories. (Finkel Dec., Ex. 5 at § 11).

149.    The investor newsletter dated September 29, 1998 states "Our contact in Hawaii received a Demo Unit [of the Needlyzer.]"  (Finkel Dec., Ex. 5 at § 13).

150.    The fourth paragraph of the September 29, 1998 newsletter also states "Our contact in Hawaii . . . is very pleased with [the Needlyzer] and says he will be in contact with us shortly with a proposal for both Hawaii and Indonesia."  (Finkel Dec., Ex. 5 at § 14).

151.    At no time did Amro-Asian or Siddiqui receive a demonstration unit of the Needlyzer.  (Finkel Dec., Ex. 5 at § 13).

152.    At no time did Amro-Asian or Siddiqui express to Medical Disposal or Cartelli that Siddiqui was "pleased" with the Needlyzer.  (Finkel Dec., Ex. 5 at § 14).

153.    At no time did Amro-Asian or Siddiqui ever discuss with Medical Disposal or

Cartelli the purchase, sale or distribution of Medical Disposal's Needlyzer in Indonesia. (Finkel Dec., Ex. 5 at § 14).

        b.    <u>Contracts with a Company in India</u>

154.    The investor newsletter dated January 26, 1999, states in part: "in December we went to India to meet with a company … they said they plan to make an initial acquisition of 5000 [Needlyzer] units around February 1, 1999." (Finkel Dec., Ex. 7 at Ex. 11).

155.    The investor newsletter dated June 3, 1999, states in part: "India has an order in place for 5000 units and we are presently building their units for them." (Finkel Dec., Ex. 7 at Ex. 11).

156.    The investor newsletter dated August 9, 1999, states in part: "The India wire which we expected to have in our account shortly after our last letter, ended up in a holding account at the Federal Clearing House. This was caused because the money was wired into an account where the Corporate name (Medical Disposal Devices) and the account number did not match. Our attorney has been working with the attorney in India correcting the error. We had to reinvoice India for the product being purchased, with the correct Corporate name which is Global Telecom Services, (Medical Disposal Devices is a D/B/A of Global Telecom Services), and the matching Account Number. Our Attorney assures us that the client is very anxious to receive the product [sic] and expect no further delays." (Finkel Dec., Ex. 23).

157.    The newsletter dated October 1, 1999, states in part: "We have been in close contact with our Attorney who has been in constant communication with the Attorney from India, and he assures us that all the problems have been resolved and the funding is

on its way.  He tells us to have manufacturing gear up to begin production within a week.

(Finkel Dec., Ex. 24).

158.    LaTouche began having doubts on the veracity of Cartelli's statements around

August of 1999.  (Finkel Dec., Ex. 10 at 167-168).

**5.    LaTouche and Cartelli Falsely Tell Investors Waste Management Planned to Acquire Medical Disposal**

159.    On or about October 1999, Steve Epstein ("Epstein"), an employee of

Gottesman Company, a business broker, discussed with Cartelli the possibility of another

company acquiring Medical Disposal.  (Finkel Dec., Ex. 16 at 16).

160.    Among other things, Cartelli falsely told Epstein that Cartelli was Medical

Disposal's CEO, that Medical Disposal had seven offices, 200 employees and $20

million and $40 million in profits in 1997 and 1998, respectively, and that Medical

Disposal's attorney was Faber.  (Finkel Dec., Exs. 16 at 19-21; 29).

161.    The Gottesman Company did not in any way participate in the sale of Medical

Disposal.  (Finkel Dec., Exs. 6 at § 4; 16 at 27, 33).

162.    Epstein did not tell Cartelli the name of the potential acquiring company.

(Finkel Dec., Ex. 16 at 22).

163.    Epstein did not disclose the name of the potential acquiring company because

Cartelli did not sign a confidentiality agreement.  (Finkel Dec., Ex. 16 at 22).

164.    Cartelli's discussions with Epstein ended when Cartelli did not respond to

Epstein's letters to Cartelli.  (Finkel Dec., Ex. 16 at 23).

165.    No company ever offered to acquire Medical Disposal.  (Finkel Dec., Ex. 4 at

§ 38).

166.    Cartelli told LaTouche that he had negotiated Waste Management's

acquisition of Medical Disposal for $100 million. (Finkel Dec., Ex. 10 at 102-104).

167.    Cartelli told Global Telecom Services' employees that Medical Disposal was being sold. (Finkel Dec., Ex. 17 at 48-49).

168.    Cartelli gave LaTouche copies of documents reflecting that Waste Management acquired Medical Disposal for $100 million dollars. (Finkel Dec., Exs. 10 at 103-104, 110; 22).

169.    LaTouche never spoke to or met with Faber, Gottesman or any employee of the Gottesman Company. (Finkel Dec., Ex. 10 at 58, 103-104).

170.    LaTouche told investors, including Roy and Fabri, about a planned acquisition of Medical Disposal for $100 million. (Finkel Dec., Exs. 4 at § 36; 7 at § 22; 14 at § 12).

171.    LaTouche told investors that Medical Disposal needed money to pay the costs associated with completing Medical Disposal's acquisition. (Finkel Dec., Exs. 4 at § 37; 7 at § 22; 14 at § 12).

### 6.    LaTouche And Cartelli Used Investors' Funds For Undisclosed Purposes

172.    LaTouche deposited investors' funds into Medical Disposal's bank account. (Finkel Dec., Ex. 10 at 148).

173.    Medical Disposal generally used investors' funds for expenses related to operating the "900" telephone number business, such as rent and salaries for salesmen and secretaries, and paying for Cartelli's bills and son's college tuition. For example, approximately $10,785 was paid as salary for Mary Beth Mackin ("Mackin"), Cartelli's girlfriend who worked for Cartelli; approximately $7,869 was paid to Chittenden Bank for a company car; approximately $9,400 was paid to Albert Levis for rent; approximately $15,196 was paid to SNET for telephone bills; and approximately $64,729

was paid by Mackin for costs related to advertising for the "900" telephone number business.  (Finkel Dec., Exs. 12 at 227-239; 32 at § 12).

174.    LaTouche and Cartelli had signature authority for Medical Disposal's bank account.  (Finkel Dec., Exs. 10 at 38-39; 32 at § 6).

175.    Cartelli controlled Medical Disposal's bank account and was in charge of Medical Disposal's finances.  (Finkel Dec., Ex. 10 at 35, 60).

176.    Cartelli wrote approximately $176,000 worth of checks to himself from Medical Disposal's bank account.  (Finkel Dec., Ex. 32 at § 7).

177.    Cartelli also deposited at least $128,000 of investors' funds into his father's bank account.  (Finkel Dec., Ex. 32 at § 9).

178.    Cartelli also deposited at least $10,000 of investors' funds into his personal account.  (Finkel Dec., Ex. 32 at § 10).

179.    LaTouche received at least $18,000 of investors' funds.  (Finkel Dec., Ex. 32 at § 11).

180.    Medical Disposal never repaid any funds to investors.  (Finkel Dec., Ex. 10 at 158).

**C.    LaTouche And Cartelli Sold Securities In the Form of Investment Contracts and Notes**

181.    The investments of forty-two individuals were reflected by a contract, signed by LaTouche as Medical Disposal's President.  (Finkel Dec., Ex. 30).

182.    According to these contracts, individuals agreed to invest a specific sum, and Medical Disposal promised to pay these investors royalties based on the number of Needlyzers sold.  The amount of the royalty varied depending on the amount of the investment.  (Finkel Dec., Ex. 30).

183.    The contracts also provided that Medical Disposal would repay investors their entire investment with interest if Medical Disposal never sold any Needlyzers.  (Finkel Dec., Ex. 30).

184.    The investments of five individuals were reflected by a note.  (Finkel Dec., Ex. 31).

185.    The notes, which were signed by LaTouche as President of Medical Disposal, promised "limited investors" high interest rates to be paid within a short amount of time. For example, one note promised to pay the original investment plus 50% interest within 45 days.  Another note promised to pay $25,000 in 180 days for an investment of $20,000.  (Finkel Dec., Ex. 31).

Dated: New York, New York
            _____, 2004

                                        _____
                                        WILLIAM FINKEL
                                        Federal Bar Council No. CT-24904
                                        Attorney for Plaintiff
                                        Securities and Exchange Commission
                                        233 Broadway
                                        New York, New York 10279
                                        (646) 428-1716
                                        (646) 428-1977 (fax)