UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION | |
| VS. | CIVIL NO.: 3:03 CV 418(PCD) |
| GLOBAL TELECOM SERVICES, LLC d/b/a MEDICAL DISPOSAL DEVICES, ALBERT LaTOUCHE and SALVATORE CARTELLI, JR. | MAY 16, 2004 |

## DEFENDANT ALBERT LaTOUCHE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTON FOR SUMMARY JUDGMENT

### I. INTRODUCTION

The defendant, Albert LaTouche, moves this Court to deny the plaintiff's motion for summary judgment because there are genuine issues of material fact in dispute. Contrary to the plaintiff's argument, the defendant, Albert LaTouche, did not engage in fraudulent conduct or make misrepresentations or omissions of material facts in connection with the offer, purchase or sale of a security. Moreover, the plaintiff is unable to establish that defendant LaTouche acted with the requisite scienter to be liable under Section 17 (a) of the Securities and Exchange Act and Section 10(b) of the Exchange Act and Rule 10b-5.

### II. BACKGROUND

At the time of the alleged fraudulent offering of securities, Albert LaTouche, was the president of Global Telecom Services, LLC d/b/a Medical Disposal Devices (hereinafter GTS/MDD). This corporation had two separate businesses operating under the GTS umbrella; 1) selling "900" telephone numbers, and 2) marketing the Needlyzer. (LaTouche Deposition, pages 30, 33).

Sometime in the early to mid 90's, Albert LaTouche entered into the GTS business venture with his partner, Donald Maine, a retired postal worker. (Id., page 32). While Maine ran the "900" telephone number business, LaTouche continued with his full-time job as a dispatcher for a Connecticut fuel oil distributor. (Id., pages 16, 32, 165). When GTS received a proposal from Brian LaTouche to market the Needlyzer, Albert LaTouche sought to recruit a person with some marketing background who could assist GTS with this aspect of the business. (Id., pages 11-12). LaTouche recruited Salvatore Cartelli, a former acquaintance who had experience running several service stations. (Id., pages 17-18). Through his prior dealings with Cartelli, LaTouche had no reason to believe Cartelli was dishonest or disreputable. (Id., page 19, 47). Consequently, LaTouche and Cartelli entered into an oral agreement for Cartelli to market and sell the Needlyzer. (Id.)

The business plan LaTouche and Cartelli arrived at was for Cartelli to use his sales contacts throughout the United States, as well as his own contacts in the medical field to establish a network for marketing the Needlyzer product overseas. (Id, page 25). Any orders for the Needlyzer that derived from Cartelli would be submitted to Albert LaTouche who would forward the purchase orders to his brother Brian. Brian would then submit the orders to Bob Hall. (Id., pages 26-27). Cartelli would periodically update LaTouche as to the progress of his marketing campaign. Cartelli informed LaTouche of several contacts he had made with hospitals and medical supply facilities expressing interest in the product. (Id., pages 27-28).

As the marketing campaign for the Needlyzer progressed, Cartelli set up official letterhead with the Medical Disposal Device slogan (Don't Get Stuck With Someone Else's Problem) as well as creating a brochure for the product. (Id., pages 34, 50-51, 62-64). He

also opened a checking account with Fleet Bank. (Id., page 35). To fund the GTS/MDD checking account, LaTouche tapped into his personal savings to the tune of approximately $250,000. (Id.) Once the money LaTouche invested was depleted, Maine and LaTouche obtained a Small Business Loan in the amount of $100,000. (Id.)

Salvatore Cartelli was acquainted with an engineer named Joe Scafidi. He was professionally trained as an engineer and Vice President of the Brown Company. Cartelli recruited Scafidi to manufacture the Needlyzer in return for being a silent partner in the GTS/MDD business. Scafidai was an engineer working for the Brown Company in Long Island. He was going to manufacture the product as orders of the Needlyzer began filtering in. (Id., pages 43-44). At some point, LaTouche, Cartelli and Maine toured the Brown Company with Scafidi to see where the Needylzer would be manufactured. (Id., page 44). LaTouche was assured by Scafidi and Cartlli that the Brown Company could handle any orders produced by GTS/MDD. (Id., page 47).

Albert LaTouche let Cartelli keep track of the books and where the money was being spent. (Id., page 51). Cartelli received the monthly bank statements. (Id., page 52). Cartelli also showed LaTouche a list of individuals who claimed they had patent rights to the Needlyzer. (Id., page 56). Cartelli had retained the services of a patent lawyer in New York City (Attny Bob Faber) who, according to Cartelli, advised him to sell the product overseas because no one could establish they owned the exclusive patent rights to the Needlyzer. (Id., page 58). Consequently, GTS/MDD started marketing their product overseas. Cartelli also informed LaTouche that he had a working relationship with a contact at the Food and Drug Administration (FDA) who could get GTS/MDD approval for the Needlyzer within thirty days of their application. (Id., page 61, 64-65).

Sometime in approximately 1997, LaTouche began seeking investors into the GTS/MDD business. (Id., page 70). Over time, approximately 40 investors contributed money to the GTS/MDD venture. (Id., page 71). Most of the investors were friends or acquaintances of LaTouche. (Id., page 72). The investors signed contracts that were prepared by Cartelli. (Id., pages 89-90; 92-97). At some point in early '98 or '99, Sal Cartelli held a meeting for approximately 10 disgruntled investors who were given the option of having their investment monies returned. However, after some deliberations, the investors all continued to support the product and remained fully vested in the company. (Id., pages 75-79). In April of '98, GTS/MDD began distributing monthly newsletters to its investors to apprise them of the status of their investments. (Id., page 110). This information included a potential contact with the Vatican, Guatemala, England, and Singapore, (Id., pages 111-144). All of the information contained in the newsletters came from Cartelli. (Id.)

Finally, throughout the Needlyzer venture, LaTouche took no action in supervising Cartelli in the daily business operations of GTS/MDD. (Id., page 164-165). Cartelli ran the day-to-day operations of the company. (Id.)

### III. SUMMARY JUDGMENT

"Summary judgment is a procedural device that may be used effectively to bring meritless litigation quickly to an end. Its application depends upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a mater of law." Gibson v. American Broadcasting Companies, Inc. 892 F.2d 128, 1132 (2d Cir 1989)(internal quotation marks and citations omitted). "[S]ummary judgment will not lie if a dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S.Ct. 2505,2510 (1986). "In ruling on a motion for summary judgment, a court must resolve all ambiguities and inferences from the underlying facts in favor of the non-moving party." <u>Levin v. Analysis & Technology, Inc.</u>, 960 F.2d 314, 316 (2d Cir 1992). "Uncertainty as to the true state of any material fact defeats the motion." <u>Gibson,</u> supra at 1132.

Defendant LaTouche maintains he did not commit any fraud or deceit towards the investors of the Needlyzer product. As such there are genuine issues of material fact and the Court should deny the plaintiff's motion.

## IV.  ARGUMENT

Plaintiff has failed to establish a sufficient claim for fraudulent conduct committed by defendant LaTouche in connection with the investments pertaining to MDD and the Needlyzer. Therefore, the plaintiff's motion for summary judgment against defendant LaTouche should be denied.

A.  <u>LaTouche's Representations to the Investors were Made Without Any Intent to Deceive</u>

The plaintiff submits in its memorandum of law in support of its motion for summary judgment that the discovery overwhelmingly establishes that defendant LaTouche violated federal antifraud provisions. If the Court looks very closely at the entire record, the evidence will establish that LaTouche was not only a pawn who was manipulated by defendant Cartelli, he was also a victim of Cartelli's fraud and deceit. As such, the plaintiff cannot establish one of the necessary elements of fraud, namely, that the defendant acted with scienter, to support its motion for summary judgment.

The evidence establishes that LaTouche truly believed in the Needlyzer product that the company was marketing under the MDD name. He believed so much in the product that he

invested approximately $250,000 of his own personal savings into the success of this business venture. He even toured a facility on Long Island where the Needlyzer product was to be manufactured. LaTouche may have had a "pie in the sky" dreams of financial success for himself and his investors, but he certainly did not defraud anyone. His biggest downfall was when he placed his blind trust in his so called friend, Salvatore Cartelli. Being unsophisticated in the world of marketing strategies and corporate dealings, and lacking any sort of business savvy whatsoever, LaTouche entrusted his own life's savings, as well as those of his friends and family members who had also invested in the company, into the hands of Cartelli based upon his word that he (Cartelli) would watch out for everyone's best interest. LaTouches's unbridled belief in Cartelli may have been foolish and totally naïve, but it certainly was not ill-gotten.

As president of GTS, LaTouche does not contest the fact that he failed to independently verify any of the information that Cartelli provided to him about his progress in marketing the Needlyzer product. However, in all fairness to LaTouche, whenever he confronted Cartelli about an investors' concerns, Cartelli would always produce a document or some other evidence that seemed to corroborate what he was telling LaTouche. This would inevitably allay LaTouche's concerns, and he in turn would pass this information on to the investors. LaTouche considered his confronting Cartelli and being provided with verifying documentation as performing his due diligence. It should be noted that LaTouche never had any formal business training.

Defendant LaTouche adamantly proclaims his innocence and submits he never intentionally deceived any of his investors. Although he assisted in distributing a brochure to the investors about the Needlyzer, he wholeheartedly believed that the information contained

therein, to wit, 1) that the device had FDA approval, and 2) that the company owned the patent rights to the product, was truthful and accurate. According to LaTouche, Cartelli assured him that the patent issue was a non-issue based upon Cartelli's discussion with Attorney Faber, a patent attorney, who advised him that the device could be lawfully marketed overseas. Moreover, obtaining FDA approval would not pose a problem because of the contact Cartelli had with a high ranking member in the federal agency. If FDA approval ever became a problem, Cartelli indicated he could get full approval within 30 days.

There was absolutely no deceitfulness ever committed by LaTouche, at any time, towards the investors. He even provided monthly newsletters to the investors to apprise them of the progress the company was making in its marketing efforts overseas. The information that was contained in the newsletters was derived from communications LaTouche had with Salvatore Cartelli. He (Cartelli) was the only person in the organization who had direct contact with the foreign companies being recruited to market the Needlyzer product overseas. If the information contained in the newsletter was false, it was solely due to Cartelli's deceitfulness and lies, which was unbeknownst to LaTouche.

The Court may be wondering how LaTouche could have been continuously duped by his partner. However, at one point at least 10 leery investors were given the option of having all of their investment monies fully refunded. Not withstanding their concerns, after meeting with Cartelli and listening to his presentation, they too were persuaded by his personality and salesmanship to remain invested in the company. This tends to establish that Cartelli was very persuasive in his ability to promote the success of the Needlyzer product.

In summary, the Commission wants to penalize Albert LaTouche for his role in the unsuccessful business venture concerning the Needlyzer. However, there is absolutely no

shred of evidence to establish that LaTouche acted with any intent to deceive or defraud the investors. The only thing the plaintiff has demonstrated is that defendant LaTouche was unsophisticated in his business dealings with Cartelli and the investors. However, absent a showing that LaTouche acted with scienter, the motion for summary judgment should be denied.

## V.  CONCLUSION

Based on the foregoing, the Court should deny the Plaintiff's motion.

The Defendant, Albert LaTouche
By his attorney

_____
William H. Paetzold
Morarity, Paetzold & Babcock, LLC
140 Hebron Avenue, Suite 102
Glastonbury, CT 06033
Tel. (860) 657-1010
Fax (860) 657-1011
Federal Bar No.: ct10074

## CERTIFICATION

The undersigned certifies that a copy of the foregoing motion was mailed to the following counsel of record on this 17th day of May, 2004.

William Finkel, Esq.
Securities & Exchange Commission
233 Broadway
New York, NY 10279

William H. Paetzold