## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE :
      COMMISSION :
         Plaintiff, :
           :
v.            : Civil No. 3:03cv418 (PCD)
           :
GLOBAL TELECOM SERVICES L.L.C. :
      d/b/a MEDICAL DISPOSAL :
      SERVICES, ALBERT D. :
      LATOUCHE, and SALVATORE :
      J. CARTELLI, JR., :
         Defendants. :

### RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56 and Local Rule 56(a) Plaintiff moves for summary judgment. For the reasons stated herein, Plaintiff's motion is **granted**.

## I. Background[1]

In the early 1990s, the Needlyzer, a device that allegedly safely destroys hypodermic needles, was manufactured. In connection with the device Defendant Medical Disposal Services ("Medical Disposal") used the slogan "Don't get stuck with someone else's problem." In 1992, Defendant Albert D. LaTouche's ("LaTouche") brother Brian LaTouche contracted with the Needlyzer's manufacturer for the rights to market and sell the device in certain areas, including Tennessee. In 1993 or 1994 LaTouche and his brother contracted for the rights for LaTouche to sell the Needlyzer in the New England area. In 1994, LaTouche asked Defendant Salvatore J. Cartelli, Jr. ("Cartelli"), a car salesman, to help him sell the Needlyzer and manage Medical

---

[1] The facts are taken from Plaintiff's uncontested 56(a)(1) Statement [Doc. No. 24] and, in light of Defendants' failures to file Local Rule 56(a)(2) statements, are deemed admitted for the purposes of this motion as discussed herein.

Disposal's business.  In early 1994 Cartelli asked Joseph A. Scafidi ("Scafidi") to assist

with selling and marketing the device, telling Scafidi that the Needlyzer was in the

process of receiving Food and Drug Administration ("FDA") approval.  Between

September and December 1994 Scafidi worked with Cartelli to sell the Needlyzer,

including demonstrations of the device at hospitals and healthcare companies.  Because

the FDA had not approved the Needlyzer, no hospital, healthcare company, or other entity

purchased the device from LaTouche, Cartelli, or Scafidi.

Between 1992 and 1994, LaTouche unsuccessfully attempted to sell the Needlyzer

in the New England area.  A lawsuit between LaTouche's brother and the Needlyzer

manufacturer prevented the brother from supplying LaTouche with more demonstration

Needlyzers, and LaTouche temporarily ceased his efforts to sell the device.

In approximately 1996, LaTouche and Cartelli agreed to attempt to manufacture

and sell the Needlyzer without LaTouche's brother being involved.  Since December

1995, LaTouche has been President of Global Telecom Services, LLC, a Connecticut

company claiming two lines of business.  One business purportedly was the sale of "900"

telephone numbers, and the other business purportedly involved the planned manufacture

and sale of the Needlyzer.  Cartelli worked as LaTouche's partner at Medical Disposal

and was in charge of Medical Disposal's business.

Medical Disposal planned to retain a company in New York to manufacture the

Needlyzer.  In or around 1996, LaTouche and Cartelli asked Scafidi if the company where

Scafidi worked, Dayton Brown, Inc. ("Dayton Brown"), was interested in manufacturing

the Needlyzer after Medical Disposal obtained patent rights and FDA approval.  In the

summer of 1997 LaTouche and Cartelli went to Dayton Brown to discuss with Scafidi the

possibility of Dayton Brown manufacturing the Needlyzer for Medical Disposal.  Scafidi

informed them that he needed approval from Dayton Brown's Board of Directors before

the company could agree to manufacture the device.  Although Scafidi presented the idea

to the Board of Directors, they would not even consider manufacturing the Needlyzer

until Medical Disposal obtained FDA approval and patent rights, and even then only if

Medical Disposal provided all the Needlyzer parts.  Scafaldi informed Cartelli of the

Board of Directors' concerns.   Consequently, Cartelli no longer pursued the issue, and

Dayton Brown never contracted with Medical Disposal to manufacture the Needlyzer.

Moreover, Medical Disposal never contracted with any company to manufacture the

Needlyzer.

Scafidi referred Cartelli to a patent attorney, Robert Faber, to assist Medical

Disposal with acquiring the Needlyzer patent.   Between December 1996 and September

1997, Medical Disposal unsuccessfully attempted to purchase patent rights for the

Needlyzer, and Cartelli informed Scafidi that he was unable to obtain the patent rights.

LaTouche knew that Medical Disposal never acquired the patent rights, and his

brother told him it was unclear who owned the Needlyzer patent.  In November and

December 1996, LaTouche and his brother discussed the marketing rights and FDA

approval of the Needlyzer.  Around this time, LaTouche told his brother that Scafidi and

Cartelli, or their attorneys, had signed a contract with the Needlyzer's patent owners.  On

or about December 5, 1996, LaTouche's brother called one of the Needlyzer patent

owners, who told the brother that no contract was signed between Cartelli, Scafidi, or

their attorney, and the brother communicated this to LaTouche. His brother also told LaTouche that the Needlyzer was not approved by the FDA. In November 1994, LaTouche and his brother discussed that they were not allowed to sell the Needlyzer as FDA approved.

On November 26, 1996, LaTouche told his brother that Cartelli was planning to meet with an FDA official named John Lucas at Lucas's vacation home to discuss obtaining FDA approval for the Needlyzer. When LaTouche's brother called the FDA, an FDA official informed him that there were no pending requests for FDA approval of the Needlyzer, and that no FDA member would meet with someone who is applying for approval. The FDA official also informed LaTouche's brother that Lucas was not on vacation. LaTouche's brother told LaTouche about the conversation.

Cartelli was involved with creating a brochure for Medical Disposal describing the Needlyzer. Cartelli supervised Mary Beth Mackin at Global Telecom Services. In late 1997 or early 1998, Mackin asked Global Telecom Services employees to create a brochure for the Needlyzer. Cartelli and Mackin provided the employees with information for the brochure, including directions to include "FDA approval." The brochure stated that the Needlyzer was FDA approved, even though the FDA had not approved it.

Both LaTouche and Cartelli solicited investors, who were friends of LaTouche, to invest in Medical Disposal. From approximately January 1997 through July 2000, at least 47 investors invested a total of approximately $742,000 in Medical Disposal. LaTouche demonstrated the Needlyzer to various investors, and Cartelli demonstrated it to one

investor.  Both LaTouche and Cartelli gave investors brochures describing the Needlyzer, including the Medical Disposal brochure falsely describing that the Needlyzer was FDA approved.  LaTouche told investors that Medical Disposal was raising capital for the manufacturing of the Needlyzer, and that the investors' contributions would be used for that purpose.  LaTouche told investor Gaetan Roy that the Needlyzer was FDA approved and that Cartelli was his partner in Medical Disposal.  LaTouche told investors that Medical Disposal had acquired the patent rights to the Needlyzer.

 LaTouche told various investors, including Robert Nettleton and Louis Fabri, that a company in New York manufactured the Needlyzer for Medical Disposal.  Except for one visit to Dayton Brown, LaTouche never spoke to Scafidi about Dayton Brown manufacturing the device.

As noted earlier, Cartelli was Medical Disposal's contact person with Scafidi and Dayton Brown.  Cartelli told investors, including Gaetan Roy, that Medical Disposal would use investor funds to manufacture Needlyzers.  At a meeting with Roy where LaTouche was present, Cartelli told Roy that the following: (1) Medical Disposal then currently involved 41 salespersons to sell the Needlyzer, (2) the FDA had approved the Needlyzer, (3) Medical Disposal owned the patent rights to market and build the Needlyzer, (4) Medical Disposal had enough parts stored in a Florida warehouse to assemble 10,000 Needlyzer units, (5) Pfizer, a large pharmaceutical company, was testing 25 units and might order 200 additional units, and  (6) Medical Disposal had an agreement with Dayton Brown, which would begin manufacturing Needlyzers once Medical Disposal had orders for the device.

LaTouche and Cartelli attended various investor meetings, including a meeting in 1998 for approximately ten persons who invested in Medical Disposal, including Gaetan Roy and Raymond Flavell.  During this meeting Cartelli informed the investors that he ran Medical Disposal's business, that running the business was expensive, and that the investors' funds were being used to run Medical Disposal's business.  Cartelli also informed the investors that Medical Disposal had negotiated several deals with foreign companies to purchase Needlyzers.

At other times, LaTouche and Cartelli told investors about contracts with foreign companies.  In approximately August 1999, LaTouche informed an investor that Medical Disposal had large orders for the Needlyzer from companies in England and India, despite the fact that *no* company from anywhere, let alone England or India, ever entered into a contract to purchase Needlyzers from Medical Disposal.

Cartelli gave LaTouche a letter purportedly from Archbishop Zenon Grocholewski to Cartelli using the Vatican's letterhead (the "Vatican letter").  The Vatican letter stated, in part, that "[w]e will give you the support that you require to sell this product of safety [Needlyzer] to all interested Healthcare Facilities under the Vatican jurisdiction."  The Vatican letter was a forgery, and Archbishop Grocholewski did not sign the letter and did not draft the letter.  Prior to May 2002 the Archbishop had never seen the Vatican letter nor heard of Cartelli, the Medical Disposal Device, any company called Medical Disposal Devices, or the Needlyzer.  Archbishop Grocholewski never agreed, either individually or as a Vatican representative, to support the Medical Disposal Device or any product related to Cartelli.  He never used stationery with the Papal Coat of Arms letterhead.

In approximately February 1998, Cartelli showed the letter from the Vatican to Scafidi, who expressed skepticism regarding the letter. Scafidi informed Cartelli that a friend of his contacted the Vatican and confirmed that the letter was a fake. Several weeks later Cartelli admitted to Scafidi that the letter was fake.

LaTouche's brother told LaTouche not to believe Cartelli's stories of deals with foreign companies, such as deals with an Italian company, and that such pending deals alleged by Cartelli were "bogus." LaTouche gave investors, including Gaetan Roy and Louis Fabri, a copy of the Vatican letter which he alleged was from the Vatican. Cartelli told Roy about pending agreements with foreign companies and the Vatican, and stated that he expected orders for tens of thousands of Needlyzers. Cartelli informed Roy that the Needlyzer's manufacture "figures in three months we'll be putting 10,000 units out the door" and that "a thousand [Needlyzers] for Guatemala at least, and about 10,000 or about 9-10,000 for the Vatican."

Between April 1998 and October 1999, LaTouche edited and distributed monthly newsletters to investors, basing the newsletters on information from Cartelli. The newsletters described Medical Disposal's efforts to sell the Needlyzer, including contracts and pending deals with foreign entities, including companies in England, Guatemala, and India. LaTouche did not call the companies listed in the investor newsletters to verify any information contained in the newsletters. Except for one time when LaTouche traveled to Guatemala, Cartelli was the only partner at Medical Disposal who purportedly contacted any company in Guatemala, and Cartelli was the only one who purportedly contacted

companies in Italy and India.  LaTouche never saw any written agreement with any Guatemalan, Italian, or Indian company.

Between June and August 1998, Cartelli communicated with Mahbub A. Siddiqui, who owns and operates Amro-Asian Trade, Inc. ("Amro-Asian"), an export and import business located in Honolulu, Hawaii.  They discussed generally the possibility of Siddiqui's selling Needlyzers to distributors in Bangladesh and Hawaii, and no agreement to purchase, sell, or distribute Needlyzers was executed.

Notwithstanding this, LaTouche and Cartelli sent an investor newsletter dated August 26, 1998 states that "Mr. Siddiqui from Hawaii is to handle Bangladesh, and is waiting for an evaluation of the product, to see if its affordable in that country." However, Amro-Asian or Siddiqui never agreed to "handle" Bangladesh for Cartelli or Medical Disposal, and as of August 26, 1998 Siddiqui had informed Cartelli that Medical Disposal's price was too high and that he was no longer awaiting a market valuation of the Needlyzer.

The August 28, 1996 investor newsletter also stated that "[Siddiqui] has expressed . . . interest in pursuing this in eight other countries," notwithstanding the fact that neither Siddiqui nor Amro-Asian had never discussed with Cartelli or Medical Disposal the purchase, sales, or distribution of the Needlyzer in eight other countries.  Siddiqui had only engaged in preliminary discussions with Cartelli regarding the possibility of selling the Needlyzer in Bangladesh, Hawaii, and other U.S. territories.

The September 29, 1998 newsletter states that "[o]ur contact in Hawaii received a Demo Unit [of the Needlyzer]" and that the Hawaii contact "is very pleased with [the

Needlyzer] and says he will be in contact with us shortly with a proposal for both Hawaii and Indonesia." However, neither Amro-Asian nor Siddiqui ever received a Needlyzer demonstration unit, ever expressed to Medical Disposal or Cartelli that Siddiqui was "pleased" with the Needlyzer, nor ever discussed the possible purchase, sales, or distribution of the Needlyzer in Indonesia.

The January 26, 1999 investor newsletter states that "in December we went to India to meet with a company [which plans] to make an initial acquisition of 5000 [Needlyzer] units around February 1, 1999. The June 3, 1999 investor newsletter states that "India has an order in place for 5000 units and we are presently building their units for them." The August 9, 1999 investor newsletter states that

> The India wire which we expected to have in our account shortly after our last letter, ended up in a holding account at the Federal Clearing House. This was caused because the money was wired into an account where the Corporate name (Medical Disposal Devices) and the account number did not match. Our attorney has been working with the attorney in India correcting the error. We had to reinvoice India for the product being purchased, with the correct Corporate name which is Global Telecom Services, (Medical Disposal Devices is a d/b/a of Global Telecom Services), and the matching Account Number. Our Attorney assures us that the client is very anxious to receive the product [sic] and expect no further delays.

The October 1, 1999 newsletter states that "We have been in close contact with our Attorney who has been in constant communication with the Attorney from India, and he assures us that all the problems have been resolved and the funding is on its way. He tells us to have manufacturing gear up to begin production within a week."

Around August 1999, LaTouche began doubting the veracity of Cartelli's statements.

In October 1999 Steve Epstein, a business broker and employee of Gottesman Company, discussed with Cartelli the possibility of another company acquiring Medical Disposal.  Cartelli falsely told Epstein that he was Medical Disposal's Chief Executive Officer, that Medical Disposal had 7 offices and 200 employees, and had $20 million profits and $40 million profits in 1997 and 1998 respectively.  He also falsely identified Medical Disposal's attorney.  Epstein did not tell Cartelli the name of the potential acquiring company because Cartelli did not sign a confidentiality agreement.  Epstein ceased communication after Cartelli did not respond to his letters.   The Gottesman Company did not participate in the sale of Medical Disposal, and ultimately no company ever offered to acquire Medical Disposal.

Cartelli told LaTouche that he had negotiated Waste Management's acquisition of Medical Disposal for $100 million, and he told Global Telecom Service's employees that Medical Disposal was being sold.  Cartelli gave LaTouche copies of documents reflecting this alleged sale.  LaTouche never spoke with any employee of the Gottesman company, and he told investors about a planned acquisition of Medical Disposal for $100 million. LaTouche told investors that Medical Disposal needed money to pay costs associated with completing the acquisition.

LaTouche deposited investors' funds into Medical Disposal's bank account. Medical Disposal generally used investors' funds for expenses related to operating the "900" telephone number business, such as rent and salaries for salesmen and secretaries, and paying for Cartelli's bills and son's college tuition.  For example, approximately $10,785 was paid as salary for Mary Beth Mackin ("Mackin"), Cartelli's girlfriend who

worked for him; approximately $7,869 was paid to Chittendon Bank for a company car; approximately $9,400 was paid for rent; approximately $15,196 was paid for telephone bills; and approximately $64,729 was paid for costs relating to the "900" telephone number business.

Both LaTouche and Cartelli had signature authority for Medical Disposal's bank account. Cartelli controlled the bank account and was in charge of Medical Disposal's finances. Cartelli wrote approximately $176,000 worth of checks to himself from Medical Disposal's bank account, deposited at least $128,000 of investors' funds into his father's bank account, and deposited at least $10,000 of investors' funds into his personal account. LaTouche received at least $18,000 of investors' funds.

Medical Disposal never repaid any funds to investors.

The investments of 42 individuals were reflected by a contract, signed by LaTouche as Medical Disposal's President. Pursuant to the contracts, individuals agreed to invest a specific sum, and Medical Disposal promised to pay these investors royalties based on the number of Needlyzers sold. The amount of royalty varied, depending on the amount of the investment. The contracts also provided that Medical Disposal would repay investors their entire investment plus interest if Medical Disposal never sold any Needlyzers.

The investments of 5 individuals were reflected by notes. The notes, which were signed by LaTouche as President of Medical Disposal, promised "limited investors" high interest rates to be paid within a short amount of time. For example, one note promised

to pay the original investment plus 50% interest within 45 days.  Another note promised to pay $25,000 in 180 days for an investment of $20,000.

## II.    Standard

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'"  *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).  Summary judgment is proper when reasonable minds could not differ as to the import of evidence.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  "Conclusory allegations will not suffice to create a genuine issue."  *Delaware & H. R. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990).  Determinations as to the weight to accord evidence or credibility assessments of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury.  *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

### III.    Discussion

#### A.    Threshold Matter–Defendants' Failure to File Local Rule 56(a)(2) Statements

Although Defendants Cartelli and LaTouche have filed opposition memoranda, neither has filed a Local Rule 56(a)(2) statement.  As discussed later, Defendant Medical Disposal has not filed any opposition at all.  FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.  *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  The Local Rules provide that

> The papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)(2) Statement," which states in separately numbered paragraphs corresponding to the paragraphs contained in the moving party's Local Rule 56(a)(1) Statement whether each of the facts asserted by the moving party is admitted or denied.  The Local Rule 56(a)(2) Statement must also include in a separate section entitled "Disputed Issues of Material Fact" a list of each issue of material fact as to which it is contended there is a genuine issue to be tried.

D. CONN. L. CIV. R. 56(a)(2).  Local Rule 56(a)(4) provides that "[t]he Local Rule . . . 56(a)(2) Statements . . . shall be filed and served along with the motion."  The Local Rules also instruct that each 56(a)(2) Statement is to be followed by "either a specific citation to (1) the affidavit of a witness competent to testify to the facts at trial, and/or (2) evidence that would be admissible at trial."  D. CONN. L. CIV. R. 56(a)(3).  "The purpose of [Local] Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed." *Coger v. Connecticut*, 309 F. Supp. 2d 274, 277 (D. Conn. 2004).  Absent such a rule, "the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties."  *N.S. v. Stratford Bd. of Educ.*, 97 F. Supp. 2d 224, 227 (D.

Conn. 2000).  The Local Rules provide clear notice that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including . . . when the opponent fails to comply, an order granting the motion."  D. CONN. L. CIV. R. 56(a)(3).

Although Defendants' failure to comply with the Local Rules could result in an order granting the motion, the memoranda will be considered.  All facts set forth in Plaintiff's compliant Local Rule 56(a)(1) statement are deemed admitted by Defendants for the purposes of this motion. *See e. g. Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir. 1984) (facts set forth in the statement of undisputed facts were properly deemed admitted given opposing party's failure to file a local rule statement of disputed material facts; entry of summary judgment appropriate); *Coger*, 309 F. Supp. 2d at 278; *Booze v. Shawmut Bank*, 62 F. Supp. 2d 593, 595 (D. Conn. 1999).[2]

## B.    Drawing Adverse Inference Against Defendants Who Assert Fifth Amendment Privilege in Civil Litigation

Plaintiff argues that an adverse inference should be drawn against Cartelli and LaTouche because they asserted their Fifth Amendment privilege during Plaintiff's attempted depositions of them.  Pl. Mem. at 19.

---

[2]    Notwithstanding Defendants' failure to file Local Rule 56(a)(2) statements,

> in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local] Rule 56[] statement.  It must be satisfied that the citation to evidence in the record supports the assertion.

*Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.*, No. 03-7030, 2004 U.S. App. LEXIS 13634, at *3 (2d Cir. July 1, 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").  Here, upon review of the evidence cited by Plaintiff in its Local Rule 56(a)(1) statement, the Court is satisfied that Plaintiff's citations to the record support its assertions.

"While the Fifth Amendment states only that 'no person . . . shall be compelled in any criminal case to be a witness against himself,' there is no question that an individual is entitled to invoke the privilege against self-incrimination during a civil proceeding." *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 82 (2d Cir., 1995) (quoting U.S. CONST. amend. V). In civil proceedings, there are costs when a party asserts the privilege against self-incrimination; "[i]t will, for example, always disadvantage opposing parties . . . since it keeps them from obtaining information they could otherwise get." *Id.* at 82 (citation omitted). Consequently, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976); *see also SEC v. Brennan*, 230 F.3d 65, 76 (2d Cir., 2000) (finding same). "Silence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54, 44 S. Ct. 54, 68 L. Ed. 221. "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *Id.* However, while an adverse inference may arise from such silence, Plaintiff still must meet its burden of proof, and Defendants' silence, alone, does not automatically give rise to their liability. *See e.g. SEC v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir. 1994); *SEC v. Omnigene Devs., Inc.*, 105 F. Supp. 2d 1316, 1318 (D. Fl. 2000).

At the same time, "[s]ince an assertion of the Fifth Amendment is an effective way to hinder discovery and provides a convenient method for obstructing a proceeding, trial courts must be especially alert to the danger that the litigant might have invoked the privilege primarily to abuse, manipulate or gain an unfair strategic advantage over opposing parties." *4003-4005 5th Ave*., 55 F.3d at 84.  For example, "if the litigant's request to waive comes only at the eleventh hour and appears to be part of a manipulative, cat-and-mouse approach to the litigation, a trial court may be fully entitled . . . to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Id.* at 85 (citations omitted).

Ultimately, how the trial court reacts in a case where a litigant has asserted the Fifth Amendment privilege in a civil proceeding "necessarily depends on the precise facts and circumstances of each case." *Id.* Thus, the trial court must "consider[] the relevant factors and act[] with moderation to accommodate both a litigant's valid Fifth Amendment interests and the opposing parties' needs in having the litigation conducted fairly." *Id.*

Both Cartelli and LaTouche invoked the Fifth Amendment privilege when Plaintiff sought their depositions.  *See* Finkel Decl. Exh. 9 (Fifth Amendment Declaration of Albert D. LaTouche), Exh. 11 (Fifth Amendment Declaration of Salvatore J. Cartelli, Jr.).  Moreover, each invocation provides that "I understand that the Commission will rely on my assertion of the Fifth Amendment privilege contained in this Declaration in . . . moving to preclude anyone, including me, from offering my testimony concerning each

16

matter referred to [in the invocation] in any action or proceeding in the future."  Finkel

Decl. Exh. 9 ¶ 5, Finkel Decl. Exh. 11 ¶ 5.[3]

There is no evidence or assertion that Cartelli or LaTouche subsequently waived

the privilege.  Instead, in their oppositions to Plaintiff's motion for summary judgment,

Cartelli and LaTouche attempt to avoid summary judgment by referring to LaTouche's

statements made during what they deem the "LaTouche Deposition."  *See e.g.* Cartelli

Opp. at 1, LaTouche Opp. at 1. However, the so-called "LaTouche Deposition" is not a

proper deposition in this case – it is a transcript of an SEC investigative interview,

whereby LaTouche testified pursuant to a subpoena in the SEC's investigation entitled *In

the Matter of Medical Disposal Devices* (NY-6811).  LaTouche's investigative testimony

occurred on April 1, 2002, almost a year before the SEC filed the present action.  *See*

Compl. filed on March 11, 2003 [Doc. No. 1].  Because LaTouche's investigative

---

[3]     Among other things, Cartelli and LaTouche's Fifth Amendment Declarations provide that they
assert their Fifth Amendment privilege against self-incrimination to all questions regarding:

     f)     Global Telecom Services, LLC d/b/a Medical Disposal Devices ("Medical
Disposal"), including, but not limited to, all its officers, directors and employees
and any business it conducted, any income or monies it received or spent, and
any bank accounts in its name;

     g)     The Needlyzer, including, but not limited to, any knowledge, communications or
correspondences regarding: FDA approval, patent ownership, its manufacture,
marketing, distribution, sales and potential sales to foreign companies and
entities and sales and potential sales to domestic companies and entities;

     h)     Any investor in Medical Disposal, including but not limited to, any person and
professional relationship of [Cartelli], [LaTouche], Maine, Scafidi, and Medical
Disposal had with any investor and any representations made to investors;

     i)     Any bank accounts in the name of, or controlled by, [Cartelli], [LaTouche],
Mackin, Scafidi, and Medical Disposal and any bank accounts to which
[Cartelli], [LaTouche], Mackin, Scafidi, and Medical Disposal had signature
power over;

     j)     Use of proceeds of investments or other income by [Cartelli], [LaTouche],
Mackin, Scafidi, and Medical Disposal;

     k)     All Medical Disposal's clients or potential clients.

Finkel Decl. Exh. 9 ¶ 3, Finkel Decl. Exh. 11 ¶ 3.

interview occurred before Plaintiff filed this action and conducted discovery in relation to the action, it would be prejudicial for the interview to have preclusive effect, as the interview was preliminary, not comprehensive in relation to an unfiled civil action, and "could not . . . cover the same breadth of material" as a subsequent deposition regarding this action. *SEC v. Softpoint*, 958 F. Supp. 846, 858 (S.D.N.Y. 1997). As noted, Cartelli and LaTouche's Fifth Amendment Declarations include their acknowledgment that Plaintiff would rely on their invocation of Fifth Amendment privilege to preclude them from later testifying about the matters specified in the Declarations. Finkel Decl. Exh. 9 ¶ 5, Finkel Decl. Exh. 11 ¶ 5. Cartelli and LaTouche had clear notice of the possible effects of their silence.

Trying to characterize pre-civil action investigative testimony as a so-called deposition in order to create a genuine issue of material fact in an opposition to a summary judgment motion constitutes what has been deemed "eleventh hour" "cat-and-mouse" tactics. *4003-4005 5th Ave.*, 55 F.3d at 85. Accordingly, while an adverse inference may be drawn from Cartelli and LaTouche's invocation of silence during their civil depositions, the silence and adverse inference must be considered in the context of other evidence produced, or not produced, by all parties. LaTouche's testimony during the SEC investigation is not properly considered in this case.

**C.    § 17(a) of the Securities Act and § 10(b) of the Exchange Act and Rule 10(b)(5) Thereunder**

Plaintiff argues the Medical Disposal investment contracts and notes are securities, and that Cartelli and LaTouche violated § 17(a) of the Securities Act and §

10(b) of the Exchange Act and Rule 10b-5 thereunder, because (1) they made material misrepresentations and omissions, (2) they acted with scienter, and (3) they met the "in the offer or sale" and "in connection with the purchase or sale" requirements.

Section 17(a) of the 1933 Act (15 U.S.C. § 77q(a)) and Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)), along with Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) prohibit fraud in the offer, purchase, and sale of securities. *SEC v. Prater*, 289 F. Supp. 2d 39, 52 (D. Conn. 2003). These anti-fraud provisions prohibit devices or schemes to defraud, the obtaining of money by means of materially false or misleading statements, and transactions or courses of business that act as a fraud or deceit. These provisions are violated when a defendant (1) makes a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2nd Cir. 1999).

Cartelli and LaTouche only argue that there is a genuine issue of material fact regarding their state of mind, and apparently concede the remaining elements.[4]

---

[4] Even though Defendants apparently concede the other two elements, the Court must review Plaintiff's arguments to make sure it has met its summary judgment burden. The Federal Rules of Civil Procedure provide that "[i]f the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED. R. CIV. P. 56(e). The Second Circuit has reiterated that

[T]he failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.*, No. 03-7030, 2004 U.S. App. LEXIS 13634, at *2 (2d Cir. July 1, 2004).

### 1.    Material Misrepresentation

In their oppositions Cartelli and LaTouche purport to dispute Plaintiff's assertion

that they engaged in fraudulent conduct or made material misrepresentations or

omissions, *see* Cartelli Opp. at 1 and LaTouche Opp. at 1, yet they fail to advance any

arguments to support their conclusory introductory statements.  Plaintiff cites the

following as false and misleading statements of material fact:

> Cartelli drafted, and Cartelli and LaTouche distributed to investors, Medical
> Disposal's brochure falsely claiming that the FDA approved the Needlyzer.
> Between January 1997 and July 2000, LaTouche and Cartelli also met personally
> with investors and falsely told them that: (i) Medical Disposal had negotiated
> contracts with foreign companies to purchase the Needlyzer; (ii) Medical Disposal
> would use investor funds to manufacture the Needlyzer; and (iii) "a company in
> New York" was manufacturing Needlyzers for Medical Disposal.  LaTouche and
> Cartelli also falsely told investors Medical Disposal owned the patent rights for
> the Needlyzer. Between April 1998 and October 1999, Cartelli and LaTouche
> drafted, and LaTouche sent, investor newsletters falsely describing Medical
> Disposal's sales of Needlyzer units to foreign companies.  Finally, Cartelli falsely
> told LaTouche that Medical Disposal was going to be acquired for $100 million
> dollars, and LaTouche then told investors this fabricated story.

Pl. Mem. at 28-29.  Statements or omissions are material if a reasonable investor would

consider them important in the total mix of information available.  *Basic Inc. v. Levinson*,

485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).  False representations that

the Needlyzer was FDA approved, that Medical Disposal owned the patent rights, that

Medical Disposal had contracts with foreign companies, that a company was

manufacturing the Needlyzer, and that another company had offered to acquire Medical

Disposal for $100 are material, as a reasonable investor would consider these

representations as important factors in determining whether to invest.  *See SEC v.*

*Schiffer*, 1998 U.S. Dist. LEXIS 8579, at *10-11 (S.D.N.Y.  June 11, 1998) (false

representations regarding FDA approval were material); *SEC v. Research Automation Corp.*, 585 F.2d 31, 34-36 (2d Cir. 1978) (false representation regarding patent rights was material, as was false representation that company had a binding contract when it did not); *SEC v. Coates*, 137 F. Supp. 2d 413, 426 (S.D.N.Y. 2001) (representations to investors regarding firm orders, as well as omissions regarding the company's inability to manufacture or sell its products, were material); *Blasdel v. Mullenix*, 356 F. Supp. 924, 925 (W.D. Okl. 1971) (false merger statement was material).

### 2.    In Connection with the Purchase or Sale of Securities

Neither Cartelli nor LaTouche argue that their alleged actions did not occur in connection with the purchase or sale of securities.  As discussed below, Plaintiff has met its summary judgment burden of establishing, as a matter of law, that the Medical Disposal investment contracts and notes are securities.

### a.    Investment Contracts

Plaintiff argues that the first 42 investments sold by LaTouche and Cartelli in Medical Disposal are "investment contracts" under § 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).  An investment contract is an investment program that involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).  Here, 42 investors invested approximately $677,500 in Medical Disposal for the purported purpose of enabling Medical Disposal to manufacture and sell the Needlyzer.  The

investment contracts clearly provided that the investors would be paid royalties based on the number of Needlyzer units sold by the company, and that if no Needlyzers were sold the investors would be paid back with interest. Pl. Local Rule 56(a)(1) statement ¶¶ 182, 183. Therefore, the first factor, an investment of money, is found to be met.

Plaintiff argues that Medical Disposal's investment scheme constituted a common enterprise, in that each investor's investment was tied to the fortunes of other investors by a pooling of assets. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). When selling the contracts, LaTouche and Cartelli told the investors that all of their investment funds would be used together to operate Medical Disposal and manufacture and sell Needlyzers, and that each investor would receive a royalty based on the total number of Needlyzer units sold. *See* Pl. Mem. at 21-22, Pl. Local Rule 56(a)(1) statement ¶¶ 182, 183. The second factor, common enterprise, is found to be met.

Finally, Plaintiff argues that the third element, "with profits to come solely from the efforts of others," is met where "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise." *SEC v. Murphy*, 626 F.2d 633, 641 (9 th Cir. 1980); *see also Mayer v. Oil Field Systems Corp.*, 721 F.2d 59, 65 (2d Cir. 1983) ("Where the investing limited partners exercised no managerial role in the partnership's affairs, courts have held that limited partnership interests are securities"). Here, the role of the investors was merely to provide investment funds, and the evidence demonstrates that Defendants managed Medical Disposal and conducted its business without participation by the investors in the company's daily operations. Therefore, the third element is met.

22

The investment contracts are found to be in connection with the purchase or sale of securities.

### b.    Investment Notes

Plaintiff argues that Medical Disposal sold seven notes to five investors between February and July 2000.  Pl. Mem. at 23.

Generally, a note is "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer."  BLACK'S LAW DICT. (8th ed. 2004).  Here, LaTouche, on behalf of Medical Disposal (the notes' maker), signed the notes that acknowledged Medical Disposal's absolute promise to pay a specified investor a definite sum of money at a specified time.  The Securities Act includes notes within the definition of security.  15 U.S.C. § 77b(a)(1) ("The term 'security' means any note").  However, because "notes . . . are used in a variety of settings, not all of which involve investments. . . . the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts."  *Reves v. Ernst & Young*, 494 U.S. 56, 62-63, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990).  To determine whether a particular note is a security, the Supreme Court has adopted the "family resemblance test," which "begin[s] with a [rebuttable] presumption that every note is a security."  *Id.* at 65.[5]  The family resemblance

---

[5]    Moreover, certain items are deemed "notes" but are not considered "securities," including the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) . . . and notes evidencing loans by commercial

test enumerates four prongs to determine whether a transaction involves a "security": (1) "the motivations that would prompt a reasonable seller and buyer to enter into it"; (2) "the plan of distribution of the instrument"; (3) "the reasonable expectations of the investing public," and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering applications of the Securities Acts unnecessary." *Id.* at 66-67.

### i.  Motivation of Buyer and Seller

Regarding this prong, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security." *Id.* at 66.  However, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a 'security.'" *Id.*  "[I]n the context of notes . . . [profit] undoubtedly includes interest." *Id.* at 68 n.4.  Here, Medical Disposal's purported purpose was to raise money to facilitate the sale of the company to Waste Management, Pl. Local Rule 56(a)(1) statement ¶¶ 159-171, and the five note investors were interested in the profit in terms of high interest rates promised, Pl. Local Rule 56(a)(1) statement ¶¶ 184, 185.  Medical Disposal sold the notes to raise capital to manufacture and sell the Needlyzer, and the purchasers bought them to earn a profit.  *See Reves,* 494 U.S. at 67.

---

banks for current operations.
*Reves*, 494 U.S. at 56 (quotations omitted).

"From both sides . . . the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Id.* at 68.

### ii.    Plan of Distribution

The second prong involves a determination of whether "there is common trading for speculation or investment." *Id.* at 66 (quotation omitted).  If notes are sold to a broad segment of the public, then "common trading" is established.  *Id.* at 68.  Here, Plaintiff concedes that sales of notes to five investors does not constitute a broad segment of the market.  However, the lack of broad sales is not dispositive.  *See Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.* 768 F. Supp. 1010, 1015-16 (S.D.N.Y. 1991) ("A debt instrument may be distributed to but one investor, yet be a 'security'"); *Leemon v. Burns*, 175 F.2d 551, 559 n.14 (same); *Stoiber v. SEC*, 161 F.3d 745, 752 (D.C. Cir. 1998) (although thirteen customers do not constitute a "broad segment of the market," the solicitation of "individuals, not sophisticated institutions" and the provision of "little detail" "suggest[s] common trading").  Moreover, the "broad sale to the public" factor "must be weighed against the purchasing individual's need for the protection of the securities laws." *McNabb v. SEC*, 298 F.3d 1126, 1132 (9th Cir. 2002).  Where the notes are sold to individuals rather than "sophisticated institutions," common trading has been found. *Stoiber*, 161 F.3d at 751.  Here, the notes were sold to five individuals, Pl. Local Rule 56(a)(1) statement ¶ 184, who have a legitimate need for protection by securities laws.  Accordingly, the plan of distribution factor is met here.

### iii.    Reasonable Expectation of Investing Public

"[I]nstruments [are considered] to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Reves*, 494 U.S. at 66.  "Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments." *Stoiber*, 161 F.3d at 751 (citing *Reves*, 494 U.S. at 68-69).  "When a note seller calls a note an investment, in the absence of contrary indications 'it would be reasonable for a prospective purchaser to take the [offeror] at its word.'" *Id.* (quoting *Reves*, 494 U.S. at 69).  Here, the notes explicitly state "For being a Limited Investor in the amount of."  Finkel Decl. Exh. 52, Pl. Local Rule 56(a)(1) statement ¶ 185.  Therefore, the reasonable expectation of investors is that they were investing in a security.

### iv.    Existence of Risk Reducing Factors

The final factor looks to see if any regulatory scheme other than the federal Securities Acts adequately reduces the risk.  *Reves*, 494 U.S. at 69.  Here, there is no evidence to indicate that Medical Disposal's notes were insured, collateralized, or covered by any other regulatory scheme to protect investors.  *See id.* (noting that an alternative regulatory scheme, collateral, or insurance are generally considered risk-reducing).  Therefore, here "the notes would escape federal regulation entirely if the [Securities] Act were held not to apply."  *Id.*

Accordingly, the notes are found to be in connection with the purchase or sale of securities.

### 3.      The Scienter Element

"[T]he element of scienter . . . requires a plaintiff to show that the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 194 (2d Cir. 1998). Scienter "may be established through a showing of reckless disregard for the truth." *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978) (internal quotations omitted). *See also McNulty*, 137 F.3d at 741. Proof of scienter need not be direct, but may be "a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30, 103 S. Ct. 683, 692 n.30, 74 L. Ed. 2d 548 (1983); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 58 L. Ed. 2d 698, 99 S. Ct. 642 (1978). Although issues of intent are usually inappropriate for disposition on summary judgment, *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir., 1984) (citations omitted), mere conclusory allegations about a defendant's state of mind are not enough to foreclose summary judgment, as "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### a.     LaTouche

Plaintiff argues that LaTouche (President of Medical Disposal) acted with scienter in purposely, or at least recklessly, deceiving investors.  For instance, Plaintiff notes that LaTouche distributed to investors the Medical Disposal brochure stating that the Needlyzer was FDA approved, and told investors the same, even when he knew that the FDA had not approved the device.  Pl. Mem. at 30 (citing to Pl. uncontroverted Local Rule 56(a)(1) statement ¶ 83, 88).  Plaintiff alleges that LaTouche knew that the Needlyzer was not FDA approved because his brother had informed him, and also he knew that his own early attempts to sell the device failed because of the lack of FDA approval.  Pl. Mem. at 30 (citing to Pl. uncontroverted Local Rule 56(a)(1) statement ¶ 14, 51, 57-58, 67, 83, 88).  Plaintiff also points to evidence showing that LaTouche told investors that Medical Disposal owned the Needlyzer patent rights despite knowing, through conversations with his brother that it was unclear who owned the patent, that this was false.  Pl. Mem. at 30 (citing to Pl. uncontroverted Local Rule 56(a)(1) statement ¶ 50-51, 56, 89).  Plaintiff argues that LaTouche acted recklessly in making various claims to investors without verifying them; for example, he made no efforts to verify Cartelli's statement to him that Dayton Brown was manufacturing the device, that Medical Disposal had various contracts to sell the device, or whether Waste Management was indeed acquiring Medical Disposal, notwithstanding his brother's warnings that Cartelli's claims of large deals were untrue or that he himself started doubting Cartelli's allegations around August 1999.  Pl. Mem. at 30 (citing to Pl. uncontroverted Local Rule 56(a)(1) statement ¶ 91-92 122-123, 131-137, 158, 169).

LaTouche argues that his representations to investors were not made with any intent to deceive, and that he was a "pawn" and "victim of Cartelli's fraud and deceit." LaTouche Opp. at 5.  Although he alleges that "[t]he evidence establishes that [he] truly believed in the Needlyzer product," and he invites the Court to "look[] very closely at the entire record," he does not cite to any proper evidence to support his conclusory assertions.  As noted above, the only item he refers to in support of his argument, what he refers to as the "LaTouche deposition," is actually an SEC investigative inquiry which predates the filing of this action.  He does not submit an affidavit or cite to the voluminous and meticulous evidence presented by Plaintiff, and, as discussed earlier, the Court may draw an adverse inference from invocation of the Fifth Amendment in refusing to answer questions at his deposition.

Moreover, he admits that "[a]s president of [Global Telecom Services d/b/a Medical Disposal], he failed to independently verify any of the information that Cartelli provided to him about his progress in marketing the Needlyzer product."  LaTouche Opp. at 6.  More generally, LaTouche admits that he "took no action in supervising Cartelli in the daily operations" of Medical Disposal.  LaTouche Opp. at 4.  He admits that he distributed the brochure representing that the Needlyzer had FDA approval and that Medical Devices owned the patent," and that "obtaining FDA approval would not pose a problem" because of Cartelli's alleged FDA connection and that "[i]f FDA approval ever became a problem, Cartelli indicated he could get full approval within 30 days." LaTouche Opp. at 7.  LaTouche concedes that he was fully aware that the Needlyzer did not have FDA approval, but distributed the brochures touting FDA approval nonetheless.

He admits to distributing investor newsletters, alleging that all the information in the letters was obtained from Cartelli, and that "[i]f the information contained in the newsletter was false, it was solely due to Cartelli's deceitfulness and lies, which was unbeknownst to LaTouche." LaTouche Opp. at 7. In pointing the finger at Cartelli, LaTouche tries to portray himself as an "unsophisticated" "pawn" and "victim" who was "foolish and naive" in "plac[ing] his blind trust in Cartelli." LaTouche Opp. at 5, 6.

However, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. General Electric Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quotation omitted). "[C]orporations and their officers and directors have a duty not to disseminate statements that are obviously suspicious." *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 137 F. Supp. 2d 251, 262 (S.D.N.Y. 2000). In Connecticut, where Medical Disposal was incorporated and conducted business, officers and directors have a fiduciary relationship to the corporation and its investors. *Ostrowski v. Avery*, 243 Conn. 355, 363, 703 A.2d 117 (1997).

As President of Medical Disposal, LaTouche had a responsibility to investigate and verify claims made to investors, and his "foolish and naive" and "blind" reliance on Cartelli does not absolve him of his fiduciary obligations. As Plaintiff notes, LaTouche does not dispute the following: (1) his brother told him that Medical Disposal did not have a contract for the Needlyzer's patent rights (Pl. Local Rule 56(a)(1) St. ¶ 56); (2) his brother told him that the Needlyzer was not FDA approved and that there were no pending requests for its FDA approval (Pl. Local Rule 56(a)(1) St. ¶ 57, 67); (3) his brother told him that he should not believe Cartelli's stories of deals with foreign

companies  (Pl. Local Rule 56(a)(1) St. ¶ 122); Cartelli gave him documents, such as the alleged document indicating that the Vatican endorsed the Needlyzers, that were forgeries on their face  (Pl. Local Rule 56(a)(1) St. ¶ 108); his brother told him that the pending deals mentioned by Cartelli were "bogus"  (Pl. Local Rule 56(a)(1) St. ¶ 123); LaTouche himself began doubting the truth of Cartelli's statements around August 1999, which was eleven months before soliciting his last investment  (Pl. Local Rule 56(a)(1) St. ¶ 158). Notwithstanding this, along with his admission that he failed to independently verify Cartelli's statements, he allowed Medical Disposal to make false representations which he repeated to investors.  His assertion that he invested $250,000 in the venture and that he "truly believed in the Needlyzer product,"  LaTouche Opp. at 5-6, does not erase the false representations that he made, or his reckless "blind trust" in Cartelli.

LaTouche's conclusory allegation that he lacked scienter is unconvincing.  As noted, "[t]he party opposing the motion must set forth concrete particulars, and cannot make a secret of his evidence, holding it close to his chest until the trial."  *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).  "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion."  *Id.*  In light of LaTouche's conclusory assertions of innocence, his failure to provide a Local Rule 56(a)(2) Statement, and his eleventh-hour tactic of deeming the pre-civil case SEC investigative interview as a deposition in this case, it is appropriate to draw an adverse inference from his invocation of the Fifth Amendment during this civil litigation.  Moreover, Plaintiff's memorandum is supported by substantial evidence, meticulously documented and cited.

LaTouche is found to have acted with the requisite scienter.  Even viewed in the light most favorable to Defendant, the evidence demonstrates that despite LaTouche's knowledge that the Needlyzer was not FDA approved, he represented it as having FDA approval.  Morever, at the very least he was reckless in relying on Cartelli's statements, in light of his fiduciary obligation to investors as President of Medical Disposal and in light of his brother's numerous warnings about Cartelli's representations, including the forgeries.  In addition, although LaTouche admits that he did not know who owned the patent rights, LaTouche Opp. at 3, he still told investors that Medical Disposal had acquired the Needlyzer patent rights, Pl. 56(a)(1) St. ¶ 89.

Plaintiff is **granted** summary judgment as to Defendant LaTouche.

### b.      Cartelli

Plaintiff argues that Cartelli acted with scienter in purposely, or at least recklessly, deceiving investors.  Plaintiff contends that Cartelli made false claims to investors, including the following: (1) he participated in drafting, and instructed Mackin and other Global Telecom Services employees to draft, Medical Disposal's brochure which falsely claimed that the Needlyzer was FDA approved, Pl. 56(a)(1) St. ¶ 70-75; (2) Cartelli told investors that the Needlyzer was FDA approved and that Medical Disposal owned its patent rights, Pl. 56(a)(1) St. ¶ 95-96, despite knowing this was false, Pl. 56(a)(1) St. ¶ 14, 36; (3) despite his knowledge that no company had agreed to manufacture the Needlyzer and despite his use of Medical Disposal's bank accounts for personal items, Pl. 56(a)(1) St. ¶ 40-42, 173-180, Cartelli told investors that their investment funds would be used to manufacture the Needlyzer, Pl. 56(a)(1) St. ¶ 93; (4) he knowingly or at least

recklessly told investors that the Vatican endorsed the Needlyzer, Pl. 56(a)(1) St. ¶ 108-109, 110, 120-121; (5) despite knowing that Medical Disposal did not enter into contracts with foreign companies to purchase Needlyzers, Cartelli told investors about firm contracts for Needlyzer purchases and gave LaTouche false information to include in investor newsletters, Pl. 56(a)(1) St. ¶ 104, 107, 129, 131-137.

Cartelli argues that his representations to investors were not made with any intent to deceive, because "[i]f the Court looks very closely at the entire record, the evidence will establish that Cartelli's name does not appear on any official documents. Only that of LaTouche." Cartelli Opp. at 4. Cartelli alleges that he "was not an officer or employee of LaTouche's business" and that "it is not Cartelli's fault . . . if president of [Global Telecom Services], LaTouche did not verify any of the bona fides of the Needlyzer product [sic]." Cartelli Opp. at 4. He proclaims that "he wholeheartedly believed" the information in the brochures, that the Needlyzer was FDA approved and that Medical Disposal owned the patent rights, was correct. Cartelli Opp. at 4.

Significantly, Cartelli does not cite to any evidence to support his conclusory statements of innocence. Instead, he invites to Court to scour the record. However, as noted FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute. *Amnesty Am.*, 288 F.3d at 470. Moreover, the argument that "Cartelli's name does not appear on any official documents," Cartelli Opp. at 4, does not establish that he lacked scienter. His assertion that he was not "an officer or employee of [Medical Disposal], Cartelli Opp. at 1, contradicts his admission that he "ran the day-to-day operations of the company,"

33

Cartelli Opp. at 3, and therefore acted as a *de facto* officer. *See also* Pl. uncontroverted

Local Rule 56(a)(1) Statment ¶102 (During a 1998 meeting where 10 investors were

present, "Cartelli said that he ran Medical Disposal's business").   His conclusory

argument that he believed that the FDA had approved the Needlyzer and that Medical

Disposal owned its patent rights is contradicted by the evidence submitted by Plaintiff, as

discussed earlier.  As with LaTouche, Cartelli's assertion that he "truly believed in the

Needlyzer product" does not erase his fraudulent actions.  Finally, Cartelli does not

contest Plaintiff's documented arguments that he intentionally deceived investors when

he told them (1) Medical Disposal had negotiated contracts with foreign companies to

purchase the Needlyzer; (2) Medical Disposal would use investors' funds to manufacture

Needlyzers; (3) a company in New York manufactured the Needlyzer for Medical

Disposal; and (4) Waste Management, Corp. had agreed to purchase Medical Disposal for

$100 million.  *See* Pl. Reply Brief to Cartelli Opp. at 5-6.

As with LaTouche, in light of Cartelli's conclusory assertions of innocence, his

failure to provide a Local Rule 56(a)(2) Statement, and his eleventh-hour tactic of

deeming LaTouche's pre-civil case SEC investigative interview as a deposition in this

case, it is appropriate to draw an adverse inference from his invocation of the Fifth

Amendment during this civil litigation.  Moreover, Plaintiff's memorandum is supported

by substantial evidence, meticulously documented and cited.

Cartelli is found to have misrepresented facts essential and material to the

investment he sought to induce and thus acted with consummate fraudulent intent and

scienter.

Accordingly, Plaintiff's motion for summary judgment is **granted** as to Defendant Cartelli.

### D.    Defendant Medical Disposal

Defendant Medical Disposal has not filed a memorandum in opposition to Plaintiff's motion for summary judgment.  Accordingly, as Plaintiff has met its burden on summary judgment to demonstrate that there is no genuine issue of material fact, Plaintiff's motion [Doc. No. 27] is **granted** against Defendant Medical Disposal absent opposition, for the same reasons as set forth above regarding the individual Defendants. It is apparent from all the evidence that the acts of the individual Defendants were undertaken in furtherance of the interests of the corporation as its authorized officer and agents, for which the corporation is convincingly found to be bound and legally liable. No credible evidence to the contrary has been provided.

## IV.    Remedies

Plaintiff seeks the following remedies: enjoining Defendants from future violations of federal securities laws; requiring Defendants to disgorge their ill-gotten gains; assessing civil penalties against Defendants; and permanent barring of LaTouche and Cartelli from serving as officers or directors of publicly held companies.  Pl. Mem. at 34-38.  Defendants do not contest any of these remedies, instead, as noted above, relying on conclusory allegations that they lacked the requisite scienter, as well as pointing the finger at each other.

### A.    Disgorgement

After finding federal securities law violations, district courts have broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.  *See, e.g.*, *SEC v. Lorin*, 76 F.3d 458, 461-62 (2d Cir. 1996) (per curiam); *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).  Disgorgement "seeks to deprive the defendants of their ill-gotten gains to effectuate the deterrence objectives of the securities laws." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).  "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.  The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits."  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).  "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).

Plaintiff's Local Rule 56(a)(1) statement, uncontested by Defendants, establishes that from January 1997 through July 2000, Medical Disposal raised approximately $742,000 from investors.  Pl. 56(a)(1) St. ¶ 80.  Given the overwhelming evidence regarding Cartelli and LaTouche's misrepresentations to investors, given their roles in Medical Disposal, given that no Needlyzers were ever manufactured, and given that none of the money provided by the investors was used to achieve the corporate purposes for

which they represented it was intended, it is found that Defendants shall be liable, jointly and severally, to disgorge $742,000, plus prejudgment interest of $189,368.30,[6] for a total of **$931,369.30**.

### B.    Permanent Injunction from Future Violations of Securities Laws

An injunction prohibiting a party from violating statutory provisions is appropriate where "there is a likelihood that, unless enjoined, the violations will continue." *Commodity Futures Trading Commission v. American Board of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986). "Such an injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since persistent refusals to admit any wrongdoing make it rather dubious that the offenders are likely to avoid such violations of the securities laws in the future in the absence of an injunction." *First Jersey Sec., Inc.*, 101 F.3d at 1477 (internal quotations omitted); *see also SEC v. Posner*, 16 F.3d at 521 (where defendants violated securities laws with "high degree of scienter" and failed to assure court that future violations were not likely to recur, injunction was warranted).

Here, the conduct of LaTouche and Cartelli was systematic and not an isolated occurrence, there was substantial evidence of their scienter, they have refused to admit

---

[6]    Plaintiff's calculation of prejudgment interest, uncontested by Defendants, is based on the rate of interest used by the Internal Revenue Service in computing interest due on tax underpayments and refunds, which reflects market conditions, and which method has been adopted by the SEC in administrative proceedings. Pl. Mem. at 36 (*citing* 17 C.F.R. § 201.600(b)); *First Jersey Securities*, 101 F.3d at 1476-77.

wrongdoing, and have failed to provide any assurances future violations are unlikely to occur.  The seriousness of their violations is reflected in the investors' substantial losses from investing in the fraudulent venture.  In refusing to admit personal wrongdoing, LaTouche and Cartelli merely point the finger at each other, each painting himself as an innocent victim.  Neither does so with any semblance of justification.

It is found, after consideration of all the material factors, that there is no sufficient likelihood that LaTouche and Cartelli will not commit such violations in the future, indeed quite the contrary.  An injunction shall, therefore, issue restraining LaTouche and Cartelli from violating those sections of the securities laws which they violated in the Needlyzer scheme.

### C.    Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77(t)(d), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), provide that civil penalties may be assessed against persons violating the Securities of Exchange Act.  The third tier of penalty provisions applies where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  This tier provides that "the amount of penalty for each such violation shall not exceed the greater of (i) $ 100,000 for a natural person or $ 500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 USCS § 77t(D(2))(c); 15 USCS § 77t(D)(3)(b).

Given the nature of Defendant's misrepresentations, their roles in the company, and the losses sustained by investors, civil penalties shall be assessed as follows: $100,000 against LaTouche; $100,000 against Cartelli; and $500,000 against Medical Disposal.

### D.    Permanent Injunction of LaTouche and Cartelli from Serving as Officers and Directors of Publicly Held Companies

Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2) provide that a person may be barred or suspended from serving as an officer or director of any public company if the person violated the antifraud provisions and displays "unfitness to serve as an officer or director."   To determine whether one is unfit, the following factors may be considered:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (quotation omitted).  Here, the underlying securities law violation, which ultimately deprived investors of almost $750,000 of investments, was egregious.  Cartelli and LaTouche's wrongful actions occurred over a period of three years, and were not merely isolated incidents.  LaTouche was President of Medical Disposal, and Cartelli admitted that he ran the company's day to day operations, acting as *de facto* officer.  As discussed, LaTouche and Cartelli both acted with intent or at least severe recklessness.  Cartelli used substantial investor proceeds for personal reasons, LaTouche used some investment funds for personal reasons; both used investor resources to operate the "900" telephone number branch of Global Telecom's business.

Neither has admitted any wrongdoing; to the contrary, each portrays himself as an innocent victim of the other's debasement.

LaTouche and Cartelli are found unfit to serve as an officer or director of any public company, and therefore an injunction shall enter precluding their doing so.

**V.     Conclusion**

For the reasons stated herein, Plaintiff's motion for summary judgment [Doc. No. 27] is **granted**, with the relief as set forth above.  The clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, July  15 , 2004.


_____/s/_____

Peter C. Dorsey
United States District Judge